OPINION OF THE COURT
Shanley N. Egeth, J.
TRIAL BACKGROUND AND PROCEDURE
This action by a seller of oil for damages arising out of claimed breach of contract by a buyer was scheduled for jury trial before this court. After numerous conferences it was agreed that although complex legal and factual questions were involved, the parties were capable of effecting their own stipulation as to many relevant facts, and as to the admissibility of a number of evidentiary submissions. Attempts to procure an agreement for a jury waiver were unsuccessful, but after negotiation and conferences with the court the parties consummated an agreement which formulated for specific questions as the sole issues which they would submit for jury resolution via special verdict. They further stipulated that should any other factual finding be necessary in order to decide the issues between the parties, the court was authorized to make such determinations without a jury. The trial of this action was conducted in accordance with this procedure and the jury rendered special verdicts as to the four specific written questions submitted to it.
FACTS
Based upon the stipulations, submissions, testimony and jury determination, the following findings of fact are made.
Early in January of 1974, the plaintiff, Joe Oil USA, Inc. (Joe Oil) purchased a cargo of No. 6 residual fuel oil described as “LSFO [low sulfur fuel oil] 1 percent”, at a price of $133.10 per metric ton. On January 14, 1974, while the cargo was en route to the United States aboard the MIT Khamsin, the plaintiff received a certificate of analysis from the Italian refinery where the oil had been processed, which indicated that the oil had a sulfur content of .52%. Plaintiff thereafter contracted in writing *378 with defendant Consolidated Edison, Inc. (Con Ed) to sell this cargo at a price of $17,875 per barrel, delivery to be during the period of January 24-30, 1974. The contract described the oil as .5% maximum sulfur content. The contract included a clause (more fully set forth and discussed hereafter), which provided for price adjustment negotiations between the parties under certain circumstances. Payment under the contract was conditioned upon receipt of a Saybolt [an independent tester] certificate confirming both quality and quantity. The ship arrived at the Bayonne Terminal Warehouse oil storage facilities on January 25, and the oil was discharged into three of defendant’s storage tanks, where it was mixed with other oil of varying sulfur content already in the tanks. When the Saybolt report was received, the sulfur content was described as .92%. Defendant Con Ed rejected the shipment.
Parenthetically, it is noted that at the time this agreement for a spot market purchase was consummated, the parties were aware of the existence of a shortage resulting from an existing Arab oil embargo. It was additionally known that Con Ed was then authorized to buy and burn oil within a variance of up to 1% sulfur content, and was in fact using and mixing oils with up to .6% to .8% average sulfur content, and some oils containing in excess of 1% which was acquired at a cheaper price.
A meeting was thereafter held on February 20, 1974 to consider a possible price adjustment. Joe Oil offered to reduce its $17,875 per barrel contract price by between 50 to 80 cents per barrel, based upon the market prices for oil of varying sulfur content prevailing at the time of the making of the contract. Con Ed expressed a willingness to accept the oil if it could pay about $13 per barrel, about the then prevailing market price for 1% sulfur content oil. The parties adamantly maintained their positions and no compromise agreement was reached.
The next day, February 21, 1974, plaintiff made an offer (Uniform Commercial Code, § 2-508) to cure the defect in delivery by substitution of a conforming shipment, already on a ship and due to arrive on February 28, 1974. Con Ed rejected this offer the next day indicat *379 ing it would only pay based upon then prevailing market prices. The substitute shipment arrived on March 4, 1974 and it was sold to a different purchaser.
Plaintiff thereupon initiated an action seeking specific performance and a preliminary injunction. This was denied on the ground that plaintiff had an adequate remedy at law (decision, April 18, 1974). On May 20, 1974 plaintiff sold most of the oil involved to another purchaser and removed all but about 10,000 barrels from the storage tanks. Con Ed paid plaintiff $10.45 per barrel for the remaining 10,000 barrels, which had been mixed with other oil and then had less than .92% sulfur content.
At the close of testimony, pursuant to the agreement of the parties the jury was presented with the following four written questions, to which they responded as follows:
“Q. 1) Did Con Edison negotiate in a reasonable manner and in good faith at the price adjustment meeting of February 20, 1974?
“Jury — ‘No’
“Q. 2) Did Joe Oil USA negotiate in a reasonable manner and in good faith at the meeting of February 20, 1974?
“Jury — ‘No’
“Q. 3) Did Joe Oil USA act reasonably in failing to make efforts to sell the rejected Khamsin oil until May of 1974 under all of the circumstances in evidence?
“Jury — ‘Yes’
“Q. 4) Did Con Edison act reasonably in rejecting the substitute shipment which was offered by Joe Oil USA on February 21, 1974, for a scheduled February 28, 1974 arrival?
“Jury — ‘Yes’ ” .
PRELIMINARY CONTENTIONS
Initially Con Ed argués that it received delivery of oil which failed to meet its contract requirements, that it transmitted a timely rejection of the shipment, and as a *380 result, it incurred no further obligation to accept the oil at a lesser price or to accept a substitute shipment. It is clear that the shipment failed to meet the contract requirement, and this court determines, despite plaintiff’s contrary protestations, that Con Ed made a timely and bona fide rejection of delivery pursuant to sections 2-601 and 2-602 of the Uniform Commercial Code. It cannot be validly posited that placing the oil into tanks where it was mixed with other oil (with plaintiff’s knowledge), was an “act inconsistent with the seller’s ownership” so as to constitute an acceptance (Uniform Commercial Code, § 2-206, subd [1], par [c]). While it may have been more prudent to await the inspection certificate before mixing the oil, the process is analogous to permissible treatment of fungible goods under the code (see Uniform Commercial Code, § 1-201, subd [17]; cf. § 7-207), which would not in and of itself bar a rejection of delivery.
Assuming the existence of a proper and timely rejection of delivery by the purchaser, the rights of the parties cannot be adjudicated without resolving either or both of the two other issues.
CONTROLLING ISSUES RAISED
(1) Price adjustment negotiation — was Con Ed obligated under the contract to negotiate a price adjustment, and did it breach its contract by a failure to so negotiate in good faith?
(2) Conforming shipment — was Con Ed required to accept a preferred cure of defective delivery in the form of a substitute conforming shipment pursuant to section 2-508 of the Uniform Commercial Code, and did it breach its contract by its failure to do so?
PRICE ADJUSTMENT NEGOTIATIONS
Assuming a proper and timely rejection of the shipment by Con Ed, the next question raised is whether the parties were compelled by contract or statute to negotiate a price adjustment, and if so, whether they did so in good faith. Joe Oil argues that Con Ed was required to do so, and that the jury properly found that Con Ed did not negotiate in good faith, but the jury finding that it *381 (Joe) did not do so was unsupported by the evidence. Con Ed contends that since the contract did not mandate a price adjustment as the buyer’s exclusive remedy for a nonconforming delivery, it was not required to negotiate. It further asserts that even if this were not so, the jury finding that Joe Oil did not negotiate in good faith, bars a recovery by Joe Oil based upon any Con Ed lack of good faith in the negotiations.
Under all of the surrounding circumstances the rights of the parties hereto cannot be resolved based upon the extent and nature of the price adjustment negotiations, or the conduct of the parties therein. The jury findings of lack of good faith by both parties in the said negotiations are irrelevant in determining the ultimate rights of the parties hereto.
The contract provision dealing with withholding and price adjustment reads as follows: “Withholding: It is further agreed by the parties hereto that the buyer shall not withhold all or any part of the purchase price due hereunder for oil delivered hereunder for the purpose of the buyer applying such withholding to any claim arising out of another transaction or transactions between the parties hereto or any of their related companies. Nor shall the buyer make such a withholding for the purpose of applying same to claims arising out of this transaction unless the claim is substantiated by the report of any independent inspector and then only in an amount mutually agreeable to both of the parties hereto(Emphasis supplied.)
This clause does not mandate negotiation of a price adjustment as the sole and exclusive remedy available to Con Ed upon rejection of an improper shipment. This court construes the contract provision to impose an additional limitation upon the buyer’s withholding remedy authorized by section 2-717 of the Uniform Commercial Code, should the buyer seek to utilize such remedy, provided for in the code, as follows: “The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the *382 contract from any part of the price still due under the same contract.”
Section 2-719 of the Uniform Commercial Code makes it clear that absent an express agreement to the contrary, the withholding remedy herein is optional and not exclusive. Subdivision (1) of section 2-719 reads: “(b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.” The discussion in Official Comment 2 explains that the subsection “creates a presumption that clauses prescribing remedies are cumulative rather than exclusive. If the parties intend the term to describe the sole remedy under the contract, this must be clearly expressed.”
Since the contract withholding provision herein did not impose withholding and price adjustment as the exclusive remedy of the buyer in the event of a seller’s breach of contract, the contract clause did not compel either party to negotiate as to a price adjustment, or mandate that an agreement be consummated therefor. The parties certainly could not be chargeable with an obligation to negotiate in good faith, when they were not compelled to negotiate at all. It is therefore obvious that the abortive price adjustment discussions and the jury finding of lack of good faith negotiation, by both parties is wholly extraneous and irrelevant as factors which will be determinative of rights of the parties hereto.
ISSUES RAISED — RIGHT TO CURE
 The final issue to be determined is whether Joe Oil as a seller had a right to cure its contractual breach of an improper delivery by offering a substitute conforming shipment, and if so, whether it did so reasonably and seasonably. If such a right to cure does exist herein, it must then be resolved whether Con Ed breached its contract by failing to accept Joe Oil’s offer of a substitute conforming shipment. Resolution of this question raised the preliminary threshold issue as to whether the issue has been fully disposed of by the jury’s special verdict on the fourth submission when it answered “yes” to the question “Did Con Edison act reasonably in rejecting the *383 substitute shipment which was offered by Joe Oil USA on February 21, 1974, for a scheduled February 28, 1974 arrival?”
Con Ed argues that there was no right to cure by offer of a substitute shipment, that in any event the right to cure was not seasonably exercised, that Con Ed had a right to reject the offer made herein, that the jury so found, and the jury finding is conclusive as to its rights herein, and that it is therefore entitled to judgment.
Joe Oil contends that its right to cure is fixed by section 2-508 of the Uniform Commercial Code, and that by reason of the provisions thereof Con Ed had no right to reject its offer of the substitute shipment. It further argues that the jury finding is meaningless and irrelevant in that it was decided in vacuo without consideration of Con Ed’s duties under the code.
THE STATUTE
The statutory right to cure by substitution of a conforming delivery is set forth in section 2-508 of the Uniform Commercial Code, which contains the following text:
“Cure by Seller of Improper Tender or Delivery; Replacement
“(1) Where any tender or delivery by the seller is rejected because non-conforming and the. time for performance has not yet expired, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery.
“(2) Where the buyer rejects a non-conforming tender which the seller had reasonable grounds to believe would be acceptable with or without money allowance the seller may if he seasonably notifies the buyer have a further reasonable time to substitute a conforming tender.”
This code provision is one of the exceptions to the code codification (Uniform Commercial Code, § 2-601) of the precode “perfect tender rule”. Subdivision (1) thereof is clearly inapplicable to the facts in this action because the offer to cure was tendered after the expiration of the contract delivery date. This statutory provision creates *384 an absolute right in a seller to cure a rejected nonconforming delivery only when said seller elects to, and makes, a substitute conforming delivery before expiration of the contract time for performance.
It must therefore be determined whether, under all of the circumstances herein, Joe Oil enjoyed a right to cure its rejected nonconforming shipment by tender of a substitute conforming delivery pursuant to subdivision (2) of section 2-508 of the Uniform Commercial Code, and whether irrespective of the jury’s finding, Con Ed acted reasonably in rejecting plaintiff’s February 21, 1974 offer to effectuate such a conforming delivery by February 28, 1974.
The statutory provision was conceived to protect a seller from an act of a buyer which “forces the seller to breach by making a surprise rejection” (1 Hawkland, A Transactional Guide to the Uniform Commercial Code, § 1.37, p 200). The official comment to the code section cites its statutory purpose as avoidance of injustice to the seller, which is in keeping with the general principle of the code of construction in accordance with the reasonable expectations of the parties (McKinney’s Cons Laws of NY, Book 62V2, Part 1, Uniform Commercial Code, § 2-508, p 439). It sets forth the seller’s right to cure a defective tender thereunder (1) when the seller has reasonable grounds to believe the tender would be acceptable to the buyer “with or without money allowance”; (2) upon seasonable notice to the buyer of the seller’s intention to cure; and (3) upon substitution of a conforming tender within a reasonable time.
APPLICATION OF STATUTE
Before undertaking an analysis of the applicability of the statutory criteria of subdivision (2) of section 2-508 of the Uniform Commercial Code to the facts of this case, it must first be determined whether the fourth special verdict of the jury pre-empts such an inquiry. By its verdict the jury found that Con Ed acted reasonably in rejecting the Joe Oil offer of a substitute conforming shipment. At first blush it might appear that this factual jury determination is dispositive of the issue, and requires judgment *385 in favor of Con Ed. In the context of the procedure adopted by the parties and the court, this finding of fact is totally meaningless, and it must be afforded no significance in shaping the outcome of the issue at bar. The parties formed this and the other submission to the jury pursuant to their understanding that the factual verdicts would be afforded any appropriate significance when thereafter the court applied the applicable law. It was clearly understood and agreed that their mutually framed narrow factual questions would be submitted to the jury without any reference to applicable provisions or requirements of the Uniform Commercial Code, and that the court would thereafter apply the law as mandated by the code to all of the facts of the case. In accordance with this agreed procedure no instruction or information was given to the jury as to the rights or duties of the parties under the statute. Subsequent thereto, extensive post-trial memorandums were submitted to the court in which legal issues relating to the availability of the subdivision (2) of section 2-508 code remedy were argued. The statute determines plaintiff’s right to this remedy and the Con Ed right to reject the substitute tender. A finding as to seasonable notice and reasonable time to cure only has meaning as a predicate within the context of the statutory mandate. The necessary factual findings relate solely to whether the conditions required by the statute exist. The jury verdict in this case does not do this. The jury finding of reasonable rejection can have no meaning without the necessary absent statutory frame of reference. It must be ignored, and the ultimate issue must be resolved as a question of law on the basis of the actual facts adduced.
In applying those facts, there is no serious dispute that “seasonable notice” of an intention to cure the defect in delivery was given to Con Ed by Joe Oil. It was given one day after the February 20, 1974 meeting at which the parties discussed a possible price adjustment.
It is equally clear that there can be and there is no serious challenge as to the reasonableness of the notice or as to the time of the tendered curative delivery. At the time the offer was made, the substitute shipment *386 was already on a ship due to arrive February 28, 1974, one week later. It actually did arrive on March 4, 1974. In the absence of any contract provision or other evidence rendering time of the essence as to the original delivery, or any showing of any prejudice to Con Ed by the relatively short delay arising from the substitute delivery, it must be found that the statutory requirement of “seasonable notice” of an intention to cure a defective delivery with a substitute conforming delivery within a “reasonable time” has been complied with by Joe Oil.
The actual issue in dispute between these parties, on both the law and the facts, centers upon whether within the contemplation of the statute, Joe Oil had “reasonable grounds to believe” that the original January 25, 1974 shipment would be “acceptable” to Con Ed and if it had knowledge of nonconformities acquired at a time which rendered the statutorial right to cure applicable.
It is clear from the facts found herein that at the time the contract was made Joe Oil knew that Con Ed could burn fuel with up to 1% sulphur content, and was actually using oil with .6% to .8% average sulphur content, and sometimes some oil with an excess of a 1% sulphur content. Further, that after allegedly purchasing fuel with a .5% sulphur content plaintiff received a certificate from the Italian refinery (while the fuel was at sea and before delivery), indicating that it contained a .52% sulphur content, which it believed to be substantially the same as and compliant with the contract stipulation of .5%. Moreover, although it had no predelivery knowledge of the .92% sulphur content disclosed after delivery, by the Saybolt report, it would still have believed that such a shipment would have been acceptable to Con Ed based upon its prior knowledge of Con Ed purchase and use practices during this period of oil scarcity and volatile pricing. This belief was additionally buttressed by Con Ed’s expressed willingness during the February 20, 1974 meeting to keep and use the nonconforming .92% sulphur content oil, if an appropriate price adjustment could be effectuated. Therefore, prior to delivery and at the time Joe Oil made its offer to cure by tendering a new conforming shipment, it had cause to believe that *387 the original shipment would have been accepted by the buyer “with or without money allowance”. (Uniform Commercial Code, § 2-508, súbd [2].) It is obvious from the facts that the dispute between these parties evolved into one centering not upon the sulphur content of the nonconforming fuel delivered, but rather, upon the price the buyer was then prepared to pay for it in a falling price market. There can be no doubt that this dispute would not exist if the market had risen at the time.
Con Ed argues that despite the findings of fact made herein the statute does not afford Joe Oil a right to cure its nonconforming tender by a substitute shipment. It relies upon those among the conflicting academic and judicial authorities which hold that subdivision (2) of section 2-508 of the Uniform Commercial Code is only applicable to enable a seller to cure a nonconforming tender by a substitute conforming shipment, after the contract time for performance has expired, if the seller knew, prior to delivery that the original tender was nonconforming, but nevertheless reasonably believed that the nonconforming tender would be acceptable to the buyer (see, e.g., Nordstrom, Law of Sales, § 105, pp 318-321; Meads v Davis, 22 NC App 479). (Here, knowledge of the .92% content did not occur until after delivery and the expiration of the contract delivery time. Additionally the predelivery knowledge of a .52% sulphur content shipment was accompanied by the belief that the .52% oil was conforming rather than nonconforming.) A reported 1967 decision of the City Court, Oneida County, in Bartus v Riccardi (55 Misc 2d 3) effectuates a right to cure where the seller had predelivery knowledge of the nonconformity. In Bartus, the court applied subdivision (2) of section 2-508 of the Uniform Commercial Code in validating shipment of a knowingly nonconforming but newer and improved hearing aid after expiration of the time of performance, upon the assumption that plaintiff had reasonable grounds for a prior belief that the newer and better model would be acceptable to the buyer.
While this court does not quarrel with the proposition that subdivision (2) of section 2-508 applies under the factual conditions asserted by the authorities relied upon *388 by Con Ed, it does not accept the proposition that the use of the statutory remedy is limited exclusively to such circumstances. No valid logic or commercial need appears to justify excluding from the protective scope of this statutory remedy those sellers who had a reasonable prior belief that their tender of delivery was conforming and acceptable but thereafter learned otherwise upon rejection of the goods by the buyer (see, e.g., White and Summers, Uniform Commercial Code, § 8-4, p 269). The 1967 District of Columbia case of Wilson v Scampoli (228 AD2d 848 [DC App]) is frequently cited as supporting this view. There, approval was granted to cure by a substitute conforming tender to replace a defective, new, unopened factory crated television set, despite the seller’s lack of predelivery knowledge of the defect. Although the case is cited to support use of subdivision (2) of section 2-508 under such circumstances, in actuálity, because no fixed contract delivery time was specified, the remedy may have been available pursuant to subdivision (1) of section 2-508 (see Note, Uniform Commercial Code, § 2-508: Seller’s Right to Cure Non-Conforming Goods, 6 Rutgers Camden LJ 387, 390).
Although there are no New York appellate or other reported decisions directly on point, cases decided in other jurisdictions and one tangential New York case, appear to recognize or permit a seller’s statutory right to cure a nonconforming tender within a reasonable time (implicitly, if not explicitly acknowledging subdivision (2) of section 2-508) without regard to whether or not the seller had knowledge of the defect in the tender prior to delivery (Marine Mart v Pearce, 252 Ark 601; Hayes v Hettingar, 228 NW2d 181 [Iowa]; Conte v Dwan Lincoln-Mercury, 172 Conn 12; Transcontinental Refrig. Co. v Figgins, ._ Mont _, 585 P2d 1301; Reece v Yeager Ford Sales, 155 W Va 461; Beco, Inc. u Minnechaug Golf Course, 5 Conn Cir 444; Robertson Mfg. Co. v Jefferson Tile Co., 5 UCC Rep Serv 119). The foregoing cases, however, are factually distinguishable from the situation involved in the case at bar. Here, but not in the cited cases, the contract specified a date for delivery, which date had already expired when the seller sought to *389 cure the defective tender. Thus, here the existence of the right to cure would appear to be dependent upon compliance with the restrictive terms of subdivision (2) of section 2-508 of the Uniform Commercial Code, while in the cited cases (none based upon contracts which contained a specific time of performance), it may be argued that the disposition in each of those cases could have been actually made pursuant to subdivision (1) of section 2-508 (although it is not so stated therein), applying the standard of subdivision (1) of section 2-309 of the Uniform Commercial Code that where no time for shipment or delivery is set forth, delivery is to be made within a “reasonable time”. This is a flexible factual standard which employs or considers the criteria in sections 1-203, 1-204 and 2-103 of the Uniform Commercial Code of good faith and general commercial standards.
Despite any factual distinctions contained in the various cases cited, reason, logic and public policy justify extending the protective scope of this statute to those sellers who reasonably believe their tender of delivery conforms to their contract, but are subsequently confronted with a surprise buyer’s rejection based on nonconformity. Such a construction is consistent with the express purpose of subdivision (2) as a device to “avoid injustice” resulting from a surprise rejection by a buyer (Uniform Commercial Code, § 2-508, Official Comment 2). It is also consistent with overriding constructional mandate contained in the code, directing that consideration be given to the reasonable good faith expectations of the parties. The approach of Professor Nordstrom advocated by Con Ed is wholly antithetical and inconsistent with the liberal ameliorative objective of subdivision (2) of section 2-508 of the Uniform Commercial Code.
The remedy should be available to any seller who has a reasonable good faith ground to believe that the original shipment would be accepted. The dichotomy sought to be advanced by the Nordstrom disciples (which would bar redress to those without predelivery knowledge of conditions causing nonconformity, but affords relief to those who ship despite knowledge of defect or nonconformity) is totally convoluted, unjust and incongruent. The *390 innocent seller who ships his goods in good faith, reasonably believing that they are conforming and acceptable would be given no relief or redress, but all of the curative power of the statute would be made available to a more culpable seller who' delivers his nonconforming wares despite existing knowledge of its defective, nonconforming qualities. It is difficult to believe that a construction rewarding culpability and penalizing innocence is preferable, or consistent with the remedial intent of the creators of this remedy. To the contrary, this court believes that more compelling equitable considerations exist to extend the remedy in subdivision (2) of section 2-508 to those innocent sellers who have no prior predelivery knowledge of nonconformity, and only first learn of a defect following a purchaser’s postdelivery rejection of the merchandise as nonconforming. This construction facilitates the code’s mandate of liberal construction (Uniform Commercial Code, § 1-102) and administration (Uniform Commercial Code, § 1-106, subd [1]) based upon an imposed obligation of good faith in performance and enforcement (Uniform Commercial Code, § 1-203).
CONCLUSION
Having determined that subdivision (2) of section 2-508 of the Uniform Commercial Code is available to any seller who reasonably in good faith delivers nonconforming merchandise in the belief that the buyer will accept the tender (regardless of prior knowledge of nonconformity), judgment must be awarded to Joe Oil. Upon all of the facts found it is clear that the oil was initially delivered at a time when the seller had no belief that it was nonconforming (.52% on .5% contract). Subsequent discovery that it contained .92% sulfur content was still within the range of contemplation of reasonable acceptability in the context of the Doyle precontract discussions. Therefore, it must be determined that the seller had reasonable good faith grounds to believe that the shipment would be acceptable to Con Ed. Under such circumstances Joe Oil had the right to and did make a reasonable and timely offer to cure pursuant to subdivision (2) *391 of section 2-508 of the Uniform Commercial Code and the rejection thereof by Con Ed was improper.
DAMAGES
The exhibits submitted in evidence by consent provide the means of computing appropriate damages in this case. Although Con Ed was not initially liable to pay the contract price of $3,360,667.14 it became obligated in damages on February 22, 1974, the day it improperly rejected plaintiff’s reasonable offer of February 21, 1974, to substitute a conforming delivery. It therefore became liable for any reasonable loss sustained by plaintiff as a result of its breach of contract (improper rejection of tender under subdivision [2] of section 2-508). In addition to losses reasonably resulting from resale to a different purchaser, it also became liable for incidental expenses incurred in connection with return and resale of the merchandise (Uniform Commercial Code, § 2-710). It is conceded that Con Ed retained and used 9,956.46 barrels at a negotiated price of $10.45 per barrel. It therefore was entitled to a credit of $104,045. Joe Oil sold the remainder of the oil removed from the Con Ed tanks for $1,871,109.31 (stipulated invoices — $945,805.32 and $925,303.99). Con Ed is entitled to a credit for this resale price, which this court holds was reasonably procured in the open market under all of the circumstances then existing.
Although special jury verdict No. 3 finds that Joe Oil acted reasonably while failing to attempt a resale of the oil until May, 1971, this court must also reject this jury determination as not validly derived in that the jury was not instructed as to those relevant legal principles which would enable a meaningful, intelligent determination of this factual question.
Nevertheless, upon all of the facts and law this court finds that such action and delay in resale was commercially reasonable.
Plaintiff also seeks an additional $53,366.50 in additional shipping and removal charges, claiming entitlement pursuant to section 2-710 of the Uniform Commercial Code. Although the defendant Con Ed has not dealt *392 with damages in its posttrial memorandum, and has in no way communicated any opposition to such entitlement to this court, said item of damage is rejected. If Con Ed had not rejected plaintiff’s tender of a substitute conforming delivery, and if it had agreed to accept the offer of the substitute shipment then at sea, plaintiff would nevertheless have been required to remove and dispose of the original oil then in the Con Ed tanks. Therefore the cost thereof was not caused by the Con Ed breach of contract (rejection of offer to cure) but rather it was caused by plaintiff’s original breach in delivering a defective shipment. Con Ed cannot therefore be chargeable with reimbursement of this expense to plaintiff. Plaintiff is accordingly entitled to judgment in the sum of $1,385,512.83, the original contract price less the proceeds of the resale.
DECISION
Plaintiff may enter judgment against the defendant in the sum of $1,385,512.83 plus interest from February 22, 1974 together with the costs and disbursements of this action.