*577
 
 OPINION OF THE COURT
 

 Fuchsberg, J.
 

 In the first case to wend its way through our appellate courts on this question, we are asked, in the main, to decide whether a seller who, acting in good faith and without knowledge of any defect, tenders nonconforming goods to a buyer who properly rejects them, may avail itself of the cure provision of subdivision (2) of section 2-508 of the Uniform Commercial Code. We hold that, if seasonable notice be given, such a seller may offér to cure the defect within a reasonable period beyond the time when the contract was to be performed so long as it has acted in good faith and with a reasonable expectation that the original goods would be acceptable to the buyer.
 

 The factual background against which we decide this appeal is based on either undisputed proof or express findings at Trial Term. In January, 1974, midst the fuel shortage produced by the oil embargo, the plaintiff (then known as Joe Oil USA, Inc.) purchased a cargo of fuel oil whose sulfur content was represented to it as no greater than 1%. While the oil was still at sea en route to the United States in the tanker
 
 M T Khamsin,
 
 plaintiff received a certificate from the foreign refinery at which it had been processed informing it that the sulfur content in fact was .52%. Thereafter, on January 24, the plaintiff entered into a written contract with the defendant (Con Ed) for the sale of this oil. The agreement was for delivery to take place between January 24 and January 30, payment being subject to a named independent testing agency’s confirmation of quality and quantity. The contract, following a trade custom to round off specifications of sulfur content at, for instance, 1%, .5% or .3%, described that of the
 
 Khamsin
 
 oil as .5%.
 
 [1]
 
 In the course of the negotiations, the plaintiff learned that Con Ed was then authorized to buy and burn oil with a sulfur content of up to 1% and would even mix oils containing more and less to maintain that figure.
 

 When the vessel arrived, on January 25, its cargo was discharged into Con Ed storage tanks in Bayonne, New
 
 *578
 
 Jersey.
 
 [2]
 
 In due course, the independent testing people reported a sulfur content of .92%. On this basis, acting within a time frame whose reasonableness is not in question, on February 14 Con Ed rejected the shipment. Prompt negotiations to adjust the price failed; by February 20, plaintiff had offered a price reduction roughly responsive to the difference in sulfur reading, but Con Ed, though it could use the oil, rejected this proposition out of hand. It was insistent on paying no more than the latest prevailing price, which, in the volatile market that then existed, was some 25% below the level which prevailed when it agreed to buy the oil.
 

 The very next day, February 21, plaintiff offered to cure the defect with a substitute shipment of conforming oil scheduled to arrive on the
 
 S. S. Appollonian Victory
 
 on February 28. Nevertheless, on February 22, the very day after the cure was proffered, Con Ed, adamant in its intention to avail itself of the intervening drop in prices, summarily rejected this proposal too. The two cargos were subsequently sold to third parties at the best price obtainable, first that of the
 
 Appollonian
 
 and, sometime later, after extraction from the tanks had been accomplished, that of the Khamsin.
 
 [3]
 

 There ensued this action for breach of contract,
 
 [4]
 
 which, after a somewhat unconventional trial course, resulted in a nonjury decision for the plaintiff in the sum of $1,385,512.83, essentially the difference between the original contract price of $3,360,667.14 and the amount received by the plaintiff by way of resale of the
 
 Khamsin
 
 oil at what the court found as a matter of fact was a negotiated
 
 *579
 
 price which, under all the circumstances,
 
 [5]
 
 was reasonably procured in the open market. To arrive at this result, the Trial Judge, while ruling against other liability theories advanced by the plaintiff, which, in particular, included one charging the defendant with having failed to act in good faith in the negotiations for a price adjustment on the
 
 Khamsin
 
 oil (Uniform Commercial Code, § 1-203), decided as a matter of law that subdivision (2) of section 2-508 of the Uniform Commercial Code was available to the plaintiff even if it had no prior knowledge of the nonconformity. Finding that in fact plaintiff had no such belief at the time of the delivery, that what turned out to be a .92% sulfur content was “within the range of contemplation of reasonable acceptability” to Con Ed, and that seasonable notice of an intention to cure was given, the court went on to hold that plaintiff’s “reasonable and timely offer to cure” was improperly rejected
 
 (sub nom. Joc Oil USA v Consolidated Edison Co. of N. Y.,
 
 107 Misc 2d 376, 390 [Shanley N. Egeth, J.]). The Appellate Division having unanimously affirmed the judgment entered on this decision, the case is now here by our leave (CPLR 5602, subd [a], par 1, cl [i]).
 

 In support of its quest for reversal, the defendant now asserts that the trial court erred (a) in ruling that the verdict on a special question submitted for determination by a jury was irrelevant to the decision of this case, (b) in failing to interpret subdivision (2) of section 2-508 of the Uniform Commercial Code to limit the availability of the right to cure after date of performance to cases in which the seller knowingly made a nonconforming tender and (c) in calculating damages on the basis of the resale of the nonconforming cargo rather than of the substitute offered to replace it. For the reasons which follow, we find all three unacceptable.
 

 I
 

 Initially, we deal with the threshold contention over the special verdict, which, though not complex, if erroneously decided below, would require reversal. A product of an
 
 ad hoc
 
 pretrial arrangement peculiar to this case, on analysis,
 
 *580
 
 however, it presents but another example of a decision by opposing parties in a civil case to chart their own litigation course, to which, unless public policy is affronted, the law ordinarily raises no obstacle
 
 (Martin v City of Cohoes,
 
 37 NY2d 162,165-166). Here, by stipulation, the parties, who, of course, were free to waive a jury entirely, in effect relegated the special verdict, which otherwise could not be set aside merely because the court disagreed with it
 
 (Vaughn-Rees v Connolly,
 
 30 AD2d 785, affd 27 NY2d 901), to a position tantamount to that of an advisory verdict (e.g.,
 
 McKenna v Meehan,
 
 248 NY 206, 214).
 

 This came about when the parties, finding themselves in accord on most of the facts, mutually agreed that the jury only be called upon to answer four stipulated questions, and then, by the close of the testimony, went on to further limit the jury’s scope by an understanding, as they read it into the record, “that in applying the law to the facts for an ultimate determination that the Court will consider the stipulated set of facts which have been presented in writing by counsel, the resolution of the specific questions by the jury as submitted to the jury, and counsel further stipulate that, if any other necessary fact is required to enable the proper application of the law to the facts of this case and such fact is not covered by either the stipulation of facts of the parties or the finding of the jury, and if further there is testimony in the record from which a finding could be made or in testimony or evidence of any kind from which a finding of such necessary fact can be made, the parties do hereby authorize the Court nonjury to make such determination as a prerequisite to the application of the law”.
 

 That the court so understood its responsibility is clear from the language it employed in disregarding the verdict. For the only one of the four questions of which the appellant complains,
 
 [6]
 
 reads as follows: “Q. Did Con Edison act reasonably in rejecting the substitute shipment which was offered by Joe Oil USA on February 21, 1974, for a scheduled February 28, 1974 arrival?” “Jury — ‘Yes’ ’’. And the
 
 *581
 
 court’s words, in ruling, were: “The parties formed this and the other submission to the jury pursuant to their understanding that the factual verdicts would be afforded
 
 any appropriate significance
 
 when thereafter the court applied the applicable law. It was clearly understood and agreed that their mutually framed narrow factual questions would be submitted to the jury without any reference to applicable provisions or requirements of the Uniform Commercial Code, and that the court would thereafter apply the law as mandated by the code to all of the facts of the case. In accordance with this agreed procedure no instruction or information was given to the jury as to the rights or duties of the parties under the statute * * * The jury finding of reasonable rejection can have no meaning without the necessary absent statutory frame of reference” (107 Misc 2d, at p 385 [emphasis added]). The code reference in this statement, as made clear in the extensive writing in which the Trial Judge handed down his decision, was to subdivision (2) of section 2-508. As explained in part II of this opinion, while a buyer’s rejection of a nonconforming tender provides the occasion for a seller’s invocation of the statute, the buyer’s rejection is not conditioned by any requirement that it have been a reasonable or unreasonable one. Rather, the word “reasonable” is employed only to qualify a
 
 seller’s
 
 conduct once the
 
 seller
 
 invokes the statute. A finding by the jury, therefore, that the
 
 buyer’s
 
 conduct was reasonable was irrelevant to the application of section 2-508. Consequently, it was not error to ignore the jury’s answer to the question.
 

 As a final word on this issue, we also add that, to the extent that Con Ed now belabors the trial court for refusing to charge the provisions of subdivision (2) of section 2-508, suffice it to say that, since defense counsel did not join either in plaintiff’s request that the statute be read to the jury or in the consequent exception to the court’s refusal to do so, the matter was not preserved for our review
 
 (Hunt v Bankers & Shippers Ins. Co. of N. Y.,
 
 50 NY2d 938, 940; CPLR 4017, 5501, subd [a], par 3).
 

 II
 

 We turn then to the central issue on this appeal: Fairly interpreted, did subdivision (2) of section 2-508 of the
 
 *582
 
 Uniform Commercial Code require Con Ed to accept the substitute shipment plaintiff tendered? In approaching this question, we, of course, must remember that a seller’s right to cure a defective tender, as allowed by both subdivisions of section 2-508, was intended to act as a meaningful limitation on the absolutism of the old perfect tender rule, under which, no leeway being allowed for any imperfections, there was, as one court put it, just “no room * * * for the doctrine of substantial performance” of commercial obligations
 
 (Mitsubishi Goshi Kaisha v Aron & Co.,
 
 16 F2d 185, 186 [Learned Hand, J.]; see Note, Uniform Commercial Code, § 2-508; Seller’s Right to Cure Non-Conforming Goods, 6 Rutgers — Camden LJ 387-388).
 

 In contrast, to meet the realities of the more impersonal business world of our day, the code, to avoid sharp dealing; expressly provides for the liberal construction of its remedial provisions (§ 1-102) so that “good faith” and the “observance of reasonable commercial standards of fair dealing” be the rule rather than the exception in trade (see § 2-103, subd [1], par [b]), “good faith” being defined as “honesty in fact in the conduct or transaction concerned” (Uniform Commercial Code, § 1-201, subd [19]). As to section 2-508 in particular, the code’s Official Comment advises that its mission is to safeguard the seller “against surprise as a result of sudden technicality on the buyer’s part”. (Uniform Commercial Code, §2-106, Comment 2; see, also, Peters, Remedies for Breach of Contracts Relating to the Sale of Goods under the Uniform Commercial Code: A Roadmap for Article Two, 73 Yale LJ 199, 210; 51 NY Jur, Sales, § 101, p 41).
 

 Section 2-508 may be conveniently divided between provisions for cure offered when “the time for performance has not yet expired” (subd [1]), a precode concept in this State
 
 (Lowinson v Newman,
 
 201 App Div 266), and ones which, by newly introducing the possibility of a seller obtaining “a further reasonable time to substitute a conforming tender” (subd [2]), also permit cure beyond the date set for performance. In its entirety the section reads as follows:
 

 “(1) Where any tender or delivery by the seller is rejected because non-conforming and the time for performance has not yet expired, the seller may seasonably notify the buyer
 
 *583
 
 of his intention to cure and may then within the contract time make a conforming delivery.
 

 “(2) Where the buyer rejects a non-conforming tender which the seller had reasonable grounds to believe would be acceptable with or without money allowance the seller may if he seasonably notifies the buyer have a further reasonable time to substitute a conforming tender.”
 

 Since we here confront circumstances in which the conforming tender came after the time of performance, we focus on subdivision (2). On its face, taking its conditions in the order in which they appear, for the statute to apply (1) a buyer must have rejected a nonconforming tender, (2) the seller must have had reasonable grounds to believe this tender would be acceptable (with or without money allowance), and (3) the seller must have “seasonably” notified the buyer of the intention to substitute a conforming tender within a reasonable time.
 
 [7]
 

 In the present case, none of these presented a problem. The first one was easily met for it is unquestioned that, at .92%, the sulfur content of the
 
 Khamsin
 
 oil did not conform to the .5% specified in the contract and that it was rejected by Con Ed. The second, the reasonableness of the seller’s belief that the original tender would be acceptable, was supported not only by unimpeached proof that the contract’s .5% and the refinery certificate’s .52% were trade equivalents, but by testimony that, by the time the contract was made, the plaintiff knew Con Ed burned fuel with a content of up to 1%, so that, with appropriate price adjustment, the
 
 Khamsin
 
 oil would have suited its needs even if, at delivery, it was, to the plaintiff’s surprise, to test out at .92%. Further, the matter seems to have been put beyond dispute by the defendant’s readiness to take the oil at the reduced market price on February 20. Surely, on such a record, the trial court cannot be faulted for having found as a fact that the second condition too had been established.
 

 
 *584
 
 As to the third, the conforming state of the
 
 Appollonian
 
 oil is undisputed, the offer to tender it took place on February 21, only a day after Con Ed finally had rejected the
 
 Khamsin
 
 delivery and the
 
 Appollonian
 
 substitute then already was en route to the United States, where it was expected in a week and did arrive on March 4, only four days later than expected. Especially since Con Ed pleaded no prejudice (unless the drop in prices could be so regarded), it is almost impossible, given the flexibility of the Uniform Commercial Code definitions of “seasonable” and “reasonable” (n 7,
 
 supra),
 
 to quarrel with the finding that the remaining requirements of the statute also had been met.
 

 Thus lacking the support of the statute’s literal language, the defendant nonetheless would have us limit its application to cases in which a seller
 
 knowingly
 
 makes a nonconforming tender which it has reason to believe the buyer will accept. For this proposition, it relies almost entirely on a critique in Nordstrom, Law of Sales (§ 105), which rationalizes that, since a seller who believes its tender is conforming would have no reason to think in terms of a reduction in the price of the goods, to allow such a seller to cure after the time for performance had passed would make the statutory reference to a money allowance redundant.
 
 [8]
 
 Nordstrom, interestingly enough, finds it useful to buttress this position by the somewhat dire prediction, though backed by no empirical or other confirmation, that, unless the right to cure is confined to those whose nonconforming tenders are knowing ones, the incentive of sellers to timely deliver will be undermined. To this it also adds the somewhat moralistic note that a seller who is mistaken as to the quality of its goods does not merit
 
 *585
 
 additional time (Nordstrom,
 
 loc. cit.).
 
 Curiously, recognizing that the few decisions extant on this subject have adopted a position opposed to the one for which it contends, Con Ed seeks to treat these as exceptions rather than exemplars of the rule (e.g.,
 
 Wilson v Scampoli,
 
 228 A2d 848 [DC App] [goods obtained by seller from their manufacturer in original carton resold unopened to purchaser; seller held within statute though it had no reason to believe the goods defective];
 
 Appleton State Bank v Lee,
 
 33 Wis 2d 690 [seller mistakenly delivered sewing machine of wrong brand but otherwise identical to. one sold; held that seller, though it did not know of its mistake, had a right to cure by substitution]).
 
 [9]
 

 That the principle for which these cases stand goes far beyond their particular facts cannot be gainsaid. These holdings demonstrate that, in dealing with the application of subdivision (2) of section 2-508, courts have been concerned with the reasonableness of the seller’s belief that the goods would be acceptable rather than with the seller’s pretender knowledge or lack of knowledge of the defect
 
 (Wilson v Scampoli, supra;
 
 compare
 
 Zabriskie Chevrolet v Smith,
 
 99 NJ Super 441).
 

 It also is no surprise then that the afore-mentioned decisional history is a reflection of the mainstream of scholarly commentary on the subject (e.g., 1955 Report of NY Law Rev Comm, p 484; White & Summers, Uniform Commercial Code [2d ed], § 8-4, p 322; 2 Anderson, Uniform Commercial Code [2d ed], § 2-508:7; Hogan, The Highways and Some of the Byways in the Sales and Bulk Sales Articles of the Uniform Commercial Code, 48 Cornell LQ 1, 12-13; Note, Uniform Commercial Code, § 2-508: Seller’s Right to Cure Non-Conforming Goods, 6 Rutgers — Camden LJ 387, 399; Note, Commercial Law — The Effect of the Seller’s Right to Cure on the Buyer’s Remedy of Rescission, 28 Ark L Rev 297, 302-303).
 

 
 *586
 
 White and Summers, for instance, put it well, and bluntly. Stressing that the code intended cure to be “a remedy which should be carefully cultivated and developed by the courts” because it “offers the possibility of conforming the law to reasonable expectations and of thwarting the chiseler who seeks to escape from a bad bargain”
 
 (op. cit.,
 
 at pp 322-324), the authors conclude, as do we, that a seller should have recourse to the relief afforded by subdivision (2) of section 2-508 of the Uniform Commercial Code as long as it can establish that it had reasonable grounds, tested objectively, for its belief that the goods would be accepted
 
 (ibid.,
 
 at p 321). It goes without saying that the test of reasonableness, in this context, must encompass the concepts of “good faith” and “commercial standards of fair dealing” which permeate the code (Uniform Commercial Code, § 1-201, subd [19]; §§1-203, 2-103, subd [1], par [b]).
 
 [10]
 

 Ill
 

 As to the damages issue raised by the defendant, we affirm without reaching the merits. At no stage of the proceedings before the trial court did the defendant object to the plaintiff’s proposed method for their calculation, and this though the plaintiff gave ample notice of that proposal by means of a preliminary statement and pretrial memorandum filed with the court. So complete was defendant’s acquiescence in the theory thus advanced that the plaintiff was permitted to introduce its proof of the
 
 Khamsin
 
 resale alone, and without opposition. Furthermore, in consensually submitting the four jointly framed advisory questions that went to the jury, the language of one of them, which was damages-related, indicates that both parties were
 
 *587
 
 acting on the assumption that the
 
 Khamsin
 
 oil was the one with which the court was to be concerned. And, even after the decision at nisi prius revealed that the Judge had acted on such an assumption, so far as the record shows, no motion was ever made to correct it.
 

 It has long been the law that agreement on a theory of damages at trial, even if only implied, must control on appeal (see
 
 Martin v City of Cohoes,
 
 37 NY2d 162,165-166,
 
 supra; Hartshorn v Chaddock,
 
 135 NY 116, 123; 10 Carmody-Wait 2d, NY Prac, § 70:419, p 690).
 

 For all these reasons, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Meyer concur.
 

 Order affirmed.
 

 [1]
 

 . Confirmatorily, Con Ed’s brief describes .92% oil as “nominally” 1% oil.
 

 [2]
 

 . The tanks already contained some other oil, but Con Ed appears to have had no concern over the admixture of the differing sulfur contents. In any event, the efficacy of the independent testing required by the contract was not impaired by the commingling.
 

 [3]
 

 . Most of the
 
 Khamsin
 
 oil was drained from the tanks and sold at $10.75 per barrel. The balance was retained by Con Ed in its mixed form at $10.45 per barrel. The original price in January had been $17,875 per barrel.
 

 [4]
 

 . The plaintiff originally also sought an affirmative injunction to compel Con Ed to accept the
 
 Khamsin
 
 shipment or, alternatively, the
 
 Appollonian
 
 substitute. However, when a preliminary injunction was denied on the ground that the plaintiff had an adequate remedy at law, it amended its complaint to pursue the latter remedy alone.
 

 [5]
 

 . These circumstances included the fact that the preliminary injunction was not denied until April so that, by the time the
 
 Khamsin
 
 oil was sold in May, almost three months had gone by since its rejection.
 

 [6]
 

 . Of the four questions submitted to the jury, two bear no relationship to the theory on which the plaintiff succeeded, and the third, likewise disregarded by the trial court, supported the court’s damages disposition.
 

 [7]
 

 . Essentially a factual matter, “seasonable” is defined in subdivision (3) of section 1-204 of the Uniform Commercial Code as “at or within the time agreed or if no time is agreed at or within a reasonable time”. At least equally factual in character, a “reasonable time” is left to depend on the “nature, purpose and circumstances” of any action which is to be taken (Uniform Commercial Code, § 1-204, subd [2]).
 

 [8]
 

 . The premise for such an argument, which ignores the policy of the code to prevent buyers from using' insubstantial remediable or price adjustable defects to free themselves from unprofitable bargains (Hawkland, Sales and Bulk Sales Under the Uniform Commercial Code, pp 120-122), is that the words “with or without money allowance” apply only to sellers who believe their goods will be acceptable with such an allowance and not to sellers who believe their goods will be acceptable without such an allowance. But, since the words are part of a phrase which speaks of an otherwise unqualified belief that the goods will be acceptable, unless one strains for an opposite interpretation, we find insufficient reason to doubt that it intends to include both those who find a need to offer an allowance and those who do not.
 

 [9]
 

 . The only New York case to deal with this section involved a seller who knowingly tendered a “newer and improved version of the model that was actually ordered” on the contract delivery date. The court held he had reasonable grounds to believe the buyer would accept the newer model
 
 (Bartus v Riccardi,
 
 55 Misc 2d 3 [Utica City Ct, Hymes, J.]).
 

 [10]
 

 . Except indirectly, on this appeal we do not deal with the equally important protections the code affords buyers. It is as to buyers as well as sellers that the code, to the extent that it displaces traditional principles of law and equity (§ 1-103), seeks to discourage unfair or hypertechnical business conduct bespeaking a dog-eat-dog rather than a live-and-let-live approach to the marketplace (e.g., §§ 2-314, 2-315, 2-513, 2-601, 2-608). Overall, the aim is to encourage parties to amicably resolve their own problems
 
 (Ramirez v Autosport,
 
 88 NJ 277, 285; compare Restatement, Contracts 2d, Introductory Note to chapter 10, p 194 [“the wisest course is ordinarily for the parties to attempt to resolve their differences by negotiations, including clarification of expectations [and] cure of past defaults”]).