OPINION OF THE COURT
Theodore Diamond, J.
Plaintiff’s claim is for "breach of contract, conversion of property, deprivation of use of property”; as amplified by his April 22, 1985 response to interrogatories, "breach of warranty, undue deprivation of property, deprivation of service of said vehicle, harassment and furnishing of false and inaccurate information to the general public by the defendants, costs of repairs made by plaintiff, emotional and psychological cost of defendant’s actions to plaintiff.” Each defendant answered with a general denial, several affirmative defenses, and an amended answer (May 9, 1985) by GMAC counterclaimed for *441 $7,579.82 plus interest, for plaintiff’s breach of a conditional sales contract.
FINDINGS OF FACT
On May 16, 1983, plaintiff (Ayanru) purchased a new 1983 Buick Skylark from Pepper and Potter Buick. The car was manufactured by Buick Division of General Motors. The sales receipt lists GMAC as lien holder and the amount financed to be $8,500. The receipt also states that the seller disclaims all express or implied warranties as to merchantability or fitness. The car came with a 12,000-mile/12-month (whichever sooner) limited warranty, of four printed pages, provided by defendant General Motors (GM). The warranty states in part, "It is our intent to repair under the warranty, without charge, anything that goes wrong during the warranty period that is our fault”. At time of purchase, Ayanru executed a retail installment contract for $8,500 with Pepper and Potter, which was duly assigned to defendant General Motors Acceptance Corporation (GMAC). The retail installment agreement states in part, "Any holder of the consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof. Recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder.”
On June 9, 1983, Ayanru brought the car to Pepper and Potter Buick for regular maintenance, and also complained of a gas gauge that read three quarters when tank is full, and noise when turning car. At this time the mileage on the car was about 2,200 miles. Pepper and Potter is authorized to sell Buick cars and make repairs on them pursuant to the GM warranty, for which they are reimbursed by GM. That is the only relationship shown at trial between GM and Pepper and Potter. Pepper and Potter made certain adjustments to try to correct any problems that might have existed. Ayanru paid only for the regular maintenance service not covered by GM’s warranty.
On July 8, 1983, after driving 3,400 miles, Ayanru brought the car into Pepper and Potter complaining of stalling when the air conditioner was running, gas gauge malfunction, and stiffness of the steering wheel. Work was performed pursuant to the GM warranty for which Ayanru paid no money.
On July 14, 1983, Pepper and Potter sent a card to Ayanru to pick up a part for his gas tank which had been ordered from the manufacturer.
*442 On July 22, 1983, with approximately 4,000 miles registered, Ayanru brought the car back again to Pepper and Potter. He complained about the gas gauge, the steering wheel, and the air conditioner. Repairs were made pursuant to warranty for which Ayanru paid no money. This was Ayanru’s last visit to Pepper and Potter.
On September 6, 1983, he sent a letter to GMAC, and General Motors (at Buick corporate headquarters). It said in substance that since he brought the car in for repairs and that these attempts have "failed to yield any fruitful results”, he decided to stop making payments for the car and stated he would resume payments as soon as GM decided to "honor” their part of the agreement. At this point, in addition to $1,700 paid at the time of delivery, Ayanru had made two monthly payments totaling $630.34.
On October 20, 1983, Pepper and Potter sent Ayanru a mailgram asking him to bring in the car to take care of his problems. Pepper and Potter was requested to do so by GM and GMAC. Ayanru did not bring the car in for service.
On or about November 7, 1983, a Buick customer service advisor sent a letter to Ayanru, asking him to contact the service manager of Pepper and Potter so arrangements could be made to bring the car in for inspection and necessary repairs. In addition, the letter stated that Buick Motor Division would lend their own technical assistance if necessary. Ayanru did not arrange to bring in the car.
On May 22 and 25, 1984, with just under 12,000 miles registered, and more than 12 months from date of delivery, Ayanru brought the car into Mid-County Motors for repairs, for which he paid about $366. None of the repairs were related to any of the complaints made to Pepper and Potter.
Shortly thereafter, Ayanru secreted the car to avoid repossession. During October 1984, the car was repossessed and was sold for $4,250 on March 27, 1985, after sending Ayanru notices of default and pending auction; leaving a balance due of $7,579.82, pursuant to the retail installment contract.
CONCLUSIONS OF LAW
Ayanru’s claim against defendant GM for conversion of property is dismissed. There is no evidence that GM repossessed and sold the car, nor was the repossession conducted at their direction.
Ayanru’s claim against GM for deprivation of property is *443 dismissed. There is no evidence that GM took possession of the car (through Pepper and Potter Buick), for any reason other than to make repairs pursuant to a warranty. Temporary possession was taken at Ayanru’s request, for repairs.
The gravamen of the case is for breach of contract, more properly, breach of warranty, against GM and GMAC. A warranty may be either express (UCC 2-313), or implied (UCC 2-314). However, in cases not involving personal injuries, a claim for breach of implied warranty must have privity of contract (Hole v General Motors Corp., 83 AD2d 715 [3d Dept 1981]). There was no buyer-seller relationship here, so any claims for breach of implied warranty against GM must be dismissed (Conte v Dwan Lincoln-Mercury, 172 Conn 112, 374 A2d 144 [Sup Ct 1976]).
GMAC is not a manufacturer or seller of the car so there is no liability against them as such. However, as assignee of the retail installment contract, certain duties may attach. However, their duties or liability in this respect cannot be any greater than that of their assignor, Pepper and Potter. The retail installment contract expressly provided that Ayanru could assert any claims against GMAC that he could have asserted against Pepper and Potter, the seller of the car. But, language in the sales contract unambiguously disclaims all warranties, express or implied, as to merchantability or fitness. Since the language mentions merchantability and is conspicuous, it must be construed to exclude all warranties (UCC 2-316).
That leaves only a claim based on the express warranty of GM. Ayanru’s claim must be dismissed, based on the particular facts of this case. GM acted reasonably, in that Pepper and Potter did make repairs when the car was brought in. They even attempted to make repairs after Ayanru stopped making payments, but he refused to bring the car in for repair. The only continuing problem was with the gas gauge. It is true it did take a few tries to correct it. But it must have corrected, or Ayanru deemed it too insignificant to try to correct. After Ayanru stopped bringing the car into Pepper and Potter, he never took it anywhere else for that problem. Furthermore, he proved no damages. He never paid any money for repairs to Pepper and Potter except for routine maintenance, which undisputably is not covered by the warranty. He never paid any money for any repairs during the warranty period. The money he paid to Mid-County in May 1984 is not recoverable on any theory, because it was beyond the 12-month warranty *444 period. Cars are expensive to operate under the best of circumstances. There was nothing unusual about these repairs. Any claim for other expense was clearly not in the contemplation of the parties at the time the warranty was given. The express warranty states, "This warranty does not cover any economic loss”. Such economic use includes loss of use of the car; the claim for breach of express warranty and any consequential damages is dismissed against GM.
Ayanru also claims in his memorandum, although not specifically pleaded, that he revoked acceptance of the contract. Pursuant to UCC 2-608, acceptance of an item may be revoked under certain circumstances; a showing that the goods are nonconforming, and that the nonconformity substantially impairs the value of the goods to the buyer. The buyer must also show that if he didn’t know of the nonconformity at the time of acceptance, the acceptance was induced either by the difficulty of discovering the nonconformity or by seller’s assurances. (Lynx, Inc. v Ordnance Prods., 273 Md 1, 327 A2d 502 [Ct App 1974].)
Any revocation of acceptance is ineffective until the buyer notifies seller of the revocation within a reasonable time (UCC 2-608 [2]). Buyer must show more to prove proper notice than just merely stating the product is unsatisfactory (Lynx, Inc. v Ordnance Prods., supra).
In this case, any claim for revocation must fail for several reasons. First, the failure to plead revocation is fatal to the case, since it unfairly surprises the defendants. Nowhere in the pro se complaint, or bill of particulars, could defendants have discovered a claim of revocation. Plaintiff also could not succeed on revocation since the car is not in the possession, control or ownership of any party anymore. Also, there was no evidence which proved that the nonconformity, if any, substantially impaired the value of the goods to the buyer. At best, Ayanru could claim that he didn’t have a functioning gas gauge for several months. This is minor and obviously didn’t prevent use of the car. In the first year, Ayanru rode almost 12,000 miles; certainly got substantial use out of the car, and did not testify as to any demand on the car that could not be fulfilled.
The other complaints concerning steering, air conditioning or stalling were either quickly repaired, or were not proven, for failure to produce an expert as to these conditions. The experts called by Ayanru were employees of GMAC and *445 Pepper and Potter. Their testimony confirmed that Ayanru bought a perfectly good car, with a few minor problems that were resolved.
If revocation had been effective, it would have given all parties the same duties and rights as if the car had been rejected, prior to acceptance (UCC 2-608 [3]). Under the doctrine of rejection (UCC 2-601, 2-602, 2-508), the common-law rule requiring a perfect tender was rejected. Instead, the seller has a right to seasonably cure a defective tender, under the guidelines of good faith and observance of reasonable commercial standards of good dealing (T. W. Oil v Consolidated Edison Co., 57 NY2d 574 [1982]). Even if the court were to consider Ayanru’s letter of August 31, 1983, mailed September 6, as a notice of revocation, defendants could not be held liable under this theory. After receiving this letter, defendant responded promptly, trying to cure any nonconformities, if they did exist. Ayanru’s failure to comply with the requests to contact proper persons would also prevent recovery on his part. The requirement of good faith is a two-way street. The code intended cure to be "a remedy which should be carefully cultivated and developed by the courts” because it "offers the possibility of conforming the law to reasonable expectations and of thwarting the chiseler who seeks to escape from a bad bargain”. (White & Summers, Uniform Commercial Code § 8-4, at 322-324 [2d ed], cited in T. W. Oil v Consolidated Edison Co., supra, at p 586.)
But this court need not even have considered if there was a value impairing nonconformity. Certainly, the actions of Ayanru were inconsistent with revocation, and indeed the letter of August 31 was insufficient. The letter speaks only of deficiencies without any specificity, tantamount to only stating that the car was unsatisfactory, which is inadequate to give effective notice of revocation (Lynx, Inc. v Ordnance Prods., supra). The letter says that Ayanru is stopping payments until "you honor your part of the agreement”. This certainly shows that Ayanru intended to keep the car, and not to revoke. In fact, Ayanru did everything he could to maintain dominion and control over the car, including hiding the car to prevent its repossession when he stopped paying pursuant to the retail installment contract. When finally repossessed about IVz years after the "notice of revocation”, the car had 18,000 miles on it, and Ayanru hadn’t tried to return it at all. While continued use can be reasonable during a cure period, after revocation, it isn’t reasonable for buyer not to take advantage of seller’s *446 offer to cure (compare with, Conte v Dwan Lincoln-Mercury, 172 Conn 112, 374 A2d 144, supra, where the court rejected the defendant’s contention that plaintiff waived revocation, when he continued using the car while defendant tried to cure).
Finally, revocation can only be effected between the buyer and the person who sells or contracts to sell goods (Conte v Dwan Lincoln-Mercury, supra). Since Ayanru didn’t purchase the car from either defendant, he may not invoke revocation against either. There was no evidence that Pepper and Potter acted as an agent for GM for the purpose of selling cars on their behalf. Pepper and Potter sold on their own behalf; although they repaired Ayanru’s car on behalf of GM, pursuant to GM’s warranty.
Since there was no breach of warranty, or revocation of acceptance, both defendants are entitled to judgment. GMAC was justified in repossessing and selling the car, and is entitled to all damages contemplated in the retail installment contract. This includes cleaning charges, attorney’s fees, the cost of taking and storing the vehicle, etc. Credit was given for finance charge rebate, and the amount received at auction. At the time of default, there was a balance of $9,897.82. Allowing a credit of $716.92 for finance charge rebate, that leaves a net balance of $9,180.90. There was a charge of $850 for repossessing and transporting, $60 for reconditioning, $998.67 for legal costs and $539 for storage. The $50 auction fee is stricken. This should have been specified in the contract but was not. The late fee is stricken since this only applies to payments made while the debtor had possession of the car. After allowing for the auction price of $4,250, GMAC is entitled to $7,368.57, and interest from August 31, 1985.
The proof showed that all charges were reasonable. Plaintiff presented no evidence to the contrary and did not impeach any evidence presented on this issue.
An issue not raised by either party is whether Civil Court has subject matter jurisdiction to entertain a claim of revocation. CCA 202 gives it "jurisdiction of actions and proceedings for the recovery of money, actions and proceedings for the recovery of chattels and actions and proceedings for the foreclosure of liens on personal property where the amount sought to be recovered or the value of the property does not exceed $25,000.” There are other jurisdictional grants, but they do not apply here. Assuming an appropriate case with all *447 the conditions of revocation satisfied, the court could have awarded money damages for the amounts paid by Ayanru, title of the car would have gone back to "seller”, and the contract would have been voided. The court may award damages, but there is no grant of authority to transfer title or possession of the car, as in a foreclosure of a lien, which is specifically granted by statute. Therefore, the remedy would have been incomplete, hypothetically giving a plaintiff a money judgment for all payments made plus continued ownership and use of the car. Therefore, had all of the facts fallen in place, this court would not have been able to grant the relief requested.