**TRAVELERS INDEMNITY CO., as Subrogee of Windward International, Inc., Plaintiff–Appellant,**

**v.**

**MAHO MACHINE TOOL CORPORATION, Defendant–Third–Party–Plaintiff–Appellee,**

**Orange County Crating, Third–Party Defendant.**

**No. 311, Docket 91–7605.**

United States Court of Appeals, Second Circuit.

Argued Oct. 7, 1991.

Decided Dec. 9, 1991.

Roman Badiak, New York City (Badiak, Will & Maloof, on the brief), for plaintiff-appellant.

Martin S. Berglas, New York City, for defendant-third-party-plaintiff-appellee.

Before OAKES, Chief Judge, VAN GRAAFEILAND and NEWMAN, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal in an admiralty case concerns issues arising essentially under the law of sales as to the respective rights of seller and buyer when purchased goods arrive in non-conforming condition. Travelers Indemnity Company ("Travelers") appeals from the June 12, 1991, judgment of the District Court for the Southern District of New York (Charles M. Metzner, Judge) dismissing, after a bench trial, its claim as subrogee of its insured, Windward International, Inc. ("Windward"), the buyer. The seller is defendant-appellee MAHO Machine Tool Corporation ("MAHO"). The claim was dismissed primarily because of Windward's rejection of MAHO's offer of cure and, perhaps alternatively, for failure to mitigate damages. Because we conclude that neither the cure offer nor the lack of mitigation are legally sufficient to defeat the damage claim in the circumstances of this case, we reverse and remand for further findings with respect to liability and damages.

## Facts

MAHO is the American subsidiary of a German manufacturer of precision industrial milling and boring machines. MAHO contracted through a distributor, Jeffreys Engineering and Equipment Co. ("Jeffreys"), to sell Windward a MAHO 700s machine that Windward required for a new operation in Singapore. Windward agreed to pay Jeffreys $263,573. Because the machine was scheduled for exhibition at a trade show in Los Angeles, the agreement among MAHO, Jeffreys, and Windward called for the machine to be purchased by Windward after exhibition at the trade show. MAHO undertook, at its expense, to provide basic "seaworthy preparation and crating" for the machine. MAHO engaged Orange County Crating ("Orange") to crate the machine. The machine was to be transferred "FOB Los Angeles."

Travelers insured Windward against the risk of damage to the machine under a cargo policy. An endorsement provided that Travelers would pay 125 percent of Windward's purchase and transportation costs in the event of actual or constructive total loss.

When the machine arrived in Singapore on June 13, 1988, it was opened in the presence of William M. Wood, Jr., Windward's president, and Volker Huettel, MAHO's service engineer in Singapore. As recounted by the District Court,

> The machine was found to be damaged by rust. Huettel reported that the usual airtight plastic bag was cut open, no moisture absorbing bags were inside the crate, water drained out while the crate was being opened, and the blank parts of the machine had not been greased or oiled. It was Huettel's opinion that the machine had to be returned to Germany to be rebuilt because the work could not be done in Singapore.

Windward immediately notified Jeffreys that it refused to accept the machine in its condition and, at Jeffreys' suggestion, made complaint on June 15, 1988, to its insurer, Travelers, which arranged for a survey in Singapore. Mr. Pereira of Tech–Mar Marine Services

conducted that survey on June 16, 1988. He found rusting to various degrees on different surfaces of the machine. Laboratory analysis of scrapings of the rust showed that "no presence of seawater was detected." Pereira attributed the rusting to improper greasing, failure to pack the machine in a sealed envelope with a moisture absorbent, and condensation. He found that the machine had to be completely stripped down and rebuilt to achieve its 0.01 mm accuracy. He stated that Singapore did not have the facilities to do the job, and that the machine had to be returned to West Germany. He estimated the cost of repairing the machine at $100,000 to $150,000.

District Court Opinion at 2–3.

On the same day that Wood informed Jeffreys about the condition of the machine, J. Robert Icard, Jeffreys' vice-president for sales, faxed to Wood in Singapore a letter reporting the results of a conversation between Icard and a MAHO executive in West Germany. The letter stated that a "plan should be followed," which included several steps: Windward "must" file an insurance claim with its carrier; MAHO, believing the damage resulted from improper packing, will seek funds from the packer; "Windward is to return the damaged machine" to MAHO in Germany, the machine to be returned to new condition and returned to MAHO's Connecticut subsidiary for resale; MAHO will ship to Singapore a new 700s machine, one of the first to be produced in the July 1990 production schedule; MAHO will investigate the added cost of air shipment; and Windward will supply MAHO with documentation concerning damage.

In substance, MAHO offered to cure the defect in performance of the contract by replacing the machine with a new one to be manufactured in a month. Conspicuously left open by the June 13 letter was the identification of which party would pay for shipping the damaged machine back to Germany and for shipping the replacement machine to Singapore. Judge Metzner made no finding on this point, but the evidence is undisputed that MAHO expected Windward or its insurer to pay these expenses.

A June 27, 1988, letter from Jeffreys to Windward's office in Virginia stated that MAHO needed to assess the damage by disassembling the machine in Germany. The letter continued, "Transportation cost from Singapore to Phronton, West Germany would be the responsibility of Windward International." Alternatively, the letter suggested that MAHO would send its engineer to Singapore at a cost estimated not to exceed $10,000. The letter specified that Jeffreys "will need your [Windward's] purchase order to authorize MAHO's action on either alternative."

At trial, Icard, the author of the June 13 letter, testified unambiguously that "Mr. Wood would be responsible to get the damaged machine back to Germany for an estimate of repair." A MAHO executive testified that MAHO would have charged Windward's insurer with the cost of shipping the new machine and the cost of returning the old machine.

The evidence disclosed that Windward expected to finance the purchase with a loan from a Singapore bank, secured by the 700s machine, identified by its serial number. With the machine unavailable as security, Windward was not in a position to pay the additional costs of obtaining a replacement machine. As Icard testified, Wood indicated that he could not go ahead with the proposal to return the machine for a new one because he (Wood) "really ha[d] no money to pay for the additional costs involved."

As part of its offer to replace the damaged 700s machine with a new one, MAHO offered to supply Windward on an interim basis with a somewhat smaller 600c machine that was available in Singapore. It is not entirely clear whether the 600c would have been loaned at no cost or leased in the interim period. Ultimately Windward leased and then purchased the 600c machine.

Travelers paid Windward for the cost of the 700s machine, plus the 25 percent increment called for by the insurance endorsement. Travelers acquired the machine by this payment and eventually shipped it to

the United States and sold it for salvage value at a price of $32,000. From the proceeds of the insurance payment, Windward paid Jeffreys the purchase price $278,164.

Travelers, as subrogee of Windward, brought suit to recover $271,904, the difference between the CIF value of the machine (cost plus ocean freight and handling), and the salvage value, plus the expenses incurred by Travelers in having the damaged machine inspected and shipped back to the United States. As a result of stipulations and a summary judgment motion, the lawsuit was narrowed to a claim by Travelers against MAHO and a third-party claim by MAHO against Orange, the packer.

The District Court dismissed Travelers' claim on the merits, ruling that Windward had lost the right to claim damages from MAHO. The principal rationale appears to be Windward's rejection of MAHO's offer to replace the damaged 700s machine with a new one and Windward's failure to communicate the replacement offer to Travelers. Had Windward accepted the offer and communicated it to Travelers, Judge Metzner reasoned, the only damages would have been the cost of leasing the 600c machine during the interim between the arrival of the damaged machine and the arrival of the replacement machine. In addition, the District Court appears to have deemed the claim barred for failure to mitigate damages. Judge Metzner noted that had Travelers paid the $10,000 estimated cost of the expenses for MAHO's engineer to inspect the damaged machine in Singapore, the inspection "would have revealed that the cost of repairs would have been small and most likely could have been done in Singapore." The engineer's travel expenses, he noted, would have been less than three percent of the sum Travelers eventually paid.

### Discussion

Though the suit is in admiralty, both sides agree that the issues in the case involve traditional issues arising under the law of sales, and both look to the sales article of the Uniform Commercial Code at least as an analogous source of law. We discern no special maritime concerns that occasion a modification of traditional U.C.C. principles.

■ 1. *Cure.* The U.C.C. provides:

Where the buyer rejects a non-conforming tender which the seller had reasonable grounds to believe would be acceptable with or without money allowance the seller may if he seasonably notifies the buyer have a further reasonable time to substitute a conforming tender.

U.C.C. § 2–508(2). The plain import of this opportunity for cure is that both the opportunity to cure and the burden, *i.e.*, the cost, of doing so are lodged with the seller. The law of sales does not impose upon the buyer any obligation to assume the expenses of the seller in effecting a cure for the delivery of non-conforming goods. Various sections of the U.C.C. make this clear. For example, a merchant buyer rejecting non-conforming goods must follow a buyer's "reasonable" instructions to sell for the buyer's account, U.C.C. § 2–603(1), but states, "Instructions are not reasonable if on demand indemnity for expenses is not forthcoming," *id.* The merchant buyer instructed to sell non-conforming goods for the seller's account is entitled to "reimbursement from the seller or out of the proceeds for reasonable expenses," U.C.C. § 2–603(2), and if the seller offers no instructions, the buyer may ship non-perishable goods back to the seller "with reimbursement," U.C.C. § 2–604.

■ MAHO contends that Travelers must lose on the cure issue because Windward's failure to communicate the exchange offer to Travelers deprived Travelers of the opportunity to elect to pay the transportation costs and accept the offer, a course MAHO suggests would have saved Travelers money. "Even if transportation costs exceeded $25,000 . . ., it is likely that Travelers would have willingly paid that amount, rather than face the possible payment of not only the $353,599.51 it ultimately paid, but also survey and additional transportation costs." Brief for Appellee at 31. MAHO has things backwards. The issue is not whether the non-breaching buyer gave its insurer an adequate chance to

decide how best to minimize the insurance payment. The issue is whether the breaching seller made a legally sufficient offer of cure that defeats the buyer's suit for damages for delivery of non-conforming goods. Even if Travelers had been willing to pay the transportation costs and thereby perhaps save itself some money as between itself and its insured, MAHO had no right to shift those costs away from itself, either by imposing them on the buyer or by leaving them for later collection from the buyer's insurer. The cure offer defeats the damage claim only if it is a legally sufficient cure offer, and MAHO's offer was deficient.

MAHO's replacement offer was legally deficient as an offer of cure because it sought to impose upon Windward the substantial cost of returning the damaged machine to Germany and the further cost of transporting the replacement machine to Singapore. Windward, having already become obligated for the cost of transporting the original machine to Singapore, had no duty whatever to spare MAHO any of the expenses of returning the machine and delivering a new one. The option to cure a defect merely extends the time available for the seller to complete its obligations under the contract. *See* William H. Lawrence, *Cure After Breach of Contract Under the Restatement (Second) of Contracts: An Analytical Comparison with the Uniform Commercial Code*, 70 Minn. L.Rev. 713, 719 (1986).

Nor is Windward's claim defeated because it failed to inform its insurer of the replacement offer. MAHO has no rights arising from Windward's insurance contract with Travelers and cannot complain of any deficiency, if such occurred, in Windward's dealings with its insurer. If the offer of cure had been sufficient, its rejection would have precluded Windward's damage claim and consequently the subrogation claim of its insurer. Since the offer was insufficient, its rejection is without consequence. The fact that Travelers might well have been willing to pay some of MAHO's expenses, had Travelers been informed of the offer, and might have saved money by doing so is not a circumstance that inures to MAHO's benefit. As against the seller of non-conforming goods, the rights of the buyer are unaffected by whatever gratuitous largesse the buyer's insurer might care to bestow upon the seller.

MAHO contends that Windward preferred to collect the 125 percent of value from its insurer rather than accept a replacement machine. In MAHO's view, Windward has reaped a windfall by collecting under its insurance for the 700s machine and then operating with the smaller 600c machine. MAHO may be correct in its analysis of Windward's motive, but that motive does not alter MAHO's obligations. Having delivered non-conforming goods, it must either respond in damages or effect cure. Since its cure offer was deficient, it remains liable for damages.

2. *Mitigation.* The District Court appears to have placed some reliance on the doctrine of mitigation, though it is not clear whether the Court believed that lack of mitigation was an alternative ground for rejecting the damage claim, distinct from rejection of an offer of cure, or only a variant of the "rejection of cure" rationale. Judge Metzner noted that Travelers acknowledged "its obligation to mitigate damages, but argues that the expenditure of $10,000 to cover the expenses of Maho's engineer to inspect the machine in Singapore would not have been justified." District Court Opinion at 4. The District Judge added, "It seems to this court that a $10,000 expenditure, when you have decided to pay out $353,599, is not out of line.... If the expense had been incurred, the on-the-spot inspection would have revealed that the cost of repairs would have been small and most likely could have been done in Singapore." *Id.* at 4–5.

There are several problems with this rationale. First, it is immaterial whether the $10,000 expense item was large or small compared to what Travelers might have to pay pursuant to a contract of insurance with which MAHO is not concerned. The relevant question is whether it was an expense that Windward or its subrogee had to pay in order to mitigate

damages. MAHO offers no basis for the view that a buyer in receipt of non-conforming goods, or a buyer's subrogee, must relieve the seller of *the seller's* expenses as a step in the mitigation of damages. *Cf. Fisher v. First Stamford Bank and Trust Co.,* 751 F.2d 519, 524 (2d Cir. 1984) ("[T]he [defendant] Bank cannot cast a duty upon [plaintiff] Fisher, at the expense of his own interests, to make an expenditure in order to minimize the Bank's damages."). Second, even if it were thought reasonable for Travelers to have incurred the $10,000 expense for MAHO's engineer to inspect the machine in Singapore, it was *at least* as reasonable for MAHO to incur the same expense, and the victim of a breach of contract need not make expenditures to mitigate damages where the breaching party had the same opportunity to prevent damages. *See Shea–S & M Ball v. Massman–Kiewit–Early,* 606 F.2d 1245, 1249 (D.C.Cir.1979); *S.J. Groves & Sons Co. v. Warner Co.,* 576 F.2d 524, 530 (3d Cir.1978). Third, all the evidence from those who inspected the machine indicates that the repairs could not have been made in Singapore and that shipment to Germany was required. This was the view of both MAHO's engineer, Volker Huettel, and the consulting firm hired by Travelers, Tech–Mar Marine Services. Although Travelers' so-called Staller Study, which was based on an examination of photos, found mainly aesthetic damage, even this report recommended that the damaged machine be shipped to the United States for resale and did not recommend repairs in Singapore.

### Conclusion

The dismissal of appellant's claim for rejection of an offer of cure or for failure to mitigate damages was error. The judgment must be reversed, and the case remanded to determine whether MAHO is liable; if so, whether the third-party is liable; and, if liability is established, the amount of damages suffered by Windward.

Reversed and remanded.