**ALLIED SEMI–CONDUCTORS INTERNATIONAL, LIMITED, Plaintiff/Appellee,**

v.

**PULSAR COMPONENTS INTERNATIONAL, INCORPORATED, Defendant/Appellant.**

No. CV 90–3943.

United States District Court, E.D. New York.

Nov. 21, 1995.

Sioris and Molumby, New York City by Ronan J. Molumby, Gregory A. Sioris, for Plaintiff.

E'Errico & Caputo, Mineola, New York by Frank N. D'Errico, for Defendant.

## MEMORANDUM DECISION AND ORDER

SPATT, District Judge.

■ The plaintiff/appellee Allied Semi–Conductors International, Limited (the "plaintiff" or "Allied") commenced this breach of contract action on November 15, 1990 pursuant to the Court's diversity of citizenship jurisdiction. Allied is a corporation organized under the laws of the Republic of Ireland, with its principal place of business in that country. The defendant/appellant Pulsar Components International, Incorporated, (the "defendant" or "Pulsar") is a New York corporation with its principal place of business in Nassau County, New York. The substantive law of New York's version of the Uniform Commercial Code (the "U.C.C.") governs the parties' dispute. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 76, 58 S.Ct. 817, 821, 82 L.Ed. 1188 (1938), *G.A. Thompson & Co., Inc. v. Wendell J. Miller Mortgage Co., Inc.*, 457 F.Supp. 996, 998 n. 2 (S.D.N.Y.1978).

On April 9, 1991, the parties consented to have the case reassigned to United States Magistrate Judge David F. Jordan for trial, pursuant to 28 U.S.C. 636(c). Following a five day bench trial, which concluded on October 22, 1993, Judge Jordan issued an Amended Decision and Order dated December 17, 1993, in favor of Allied, and directed the Clerk of the Court to enter judgment for Allied in the amount of $331,650.00, with interest at the rate of nine (9) percent per annum from January 23, 1990 to the date of entry of judgment.

Pulsar appeals from Judge Jordan's December 17, 1993 decision, 842 F.Supp. 653. The parties agreed that appeal would lie with this Court, pursuant to 28 U.S.C. § 636(c)(4). Pulsar alleges that the trial court erred in the following: (1) exercise of personal jurisdiction; (2) misapplication of the parties' stipulated issue for trial; (3) a finding of fact with regard to Pulsar's offer to replace the goods in question; and (4) the calculation of damages.

## BACKGROUND

Allied and Pulsar are both wholesale suppliers of computer component parts. Allied ordered 50,000 computer chips from the defendant on November 29, 1988, at a unit price of $10.45 for resale to Apple Computer Ltd. ("Apple"). Pulsar accepted Allied's order, obtained chips to fill the order at a unit price of $9.25, and delivered the 50,000 chips to Allied's shipping agent KMT by December 18, 1988. Thereafter, in the same month, Allied delivered the chips to Apple. Apple paid Allied $11.00 per unit for the chips, and Allied in turn paid Pulsar the agreed price of $10.45 for the chips, or a total of $522,500.00.

Upon inspection, Apple rejected 35,000 of the computer chips as defective. Allied informed Pulsar of the defect reported by Apple in mid-April, 1989. The 35,000 chips were returned to Pulsar by Allied on August 18, 1989, at which time Pulsar issued a return merchandise authorization number. Certain negotiations regarding the terms of the return transpired during the period between April and August, 1989. Pulsar contended that it agreed to take the parts back, despite the fact that the thirty-day return period had expired, on the condition that only the parts that had tested defective would be replaced. Pulsar did not deliver conforming goods to Allied in replacement for those that were returned, nor did Pulsar return to Allied the $365,750.00 that represented Allied's payment for 35,000 of the total 50,000 chips that were ordered, delivered, paid for and subsequently returned.

Thereafter, Allied shipped 35,000 similar substitute chips to Apple in full satisfaction of the agreement between Allied and Apple. Because prices in the computer chip market had dropped precipitously since the initial transaction between the parties, 25,000 chips

of the replacement chips were purchased by Allied for only $70,875.00 ($2.835/chip) from a source other than Pulsar. No evidence regarding the source or value of the additional 10,000 chips was introduced at the trial.

Prior to the trial Pulsar agreed to concede, for purposes of the trial only, that the 35,000 parts that were rejected and returned were defective. Judge Jordan stated in his decision that the parties agreed that the sole issue to be tried was "whether Pulsar has cured the defective delivery as provided in [U.C.C.] § 2–508." Decision and Order, dated December 17, 1993 ("Decision"), at p. 5. Pulsar contends that the parties limited the trial issue to that of "cure" to avoid litigating complex technical issues relating to the quality of the computer chips. The parties disagree on the scope of the plaintiff's burden of proof on the issue of cure.

## DISCUSSION

### A. Standard of Review

■ On appeal, the trial court's findings of fact may be disturbed only if they are found to be clearly erroneous, while its conclusions of law are subject to de novo review. *See e.g. Travellers Intern. A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1574–75 (2d Cir. 1994).

### B. Personal Jurisdiction

Judge Jordan made the following findings with regard to service of the summons and complaint:

> The summons and complaint were mailed to the defendant, whose president actually received them, but failed to acknowledge receipt thereof. The defendant served but did not file an answer raising lack of *in personam* jurisdiction as a defense. Personal service was not made until after the statute of limitations had expired.

Decision, 842 F.Supp. at p. 655. Pulsar contends that the trial court erred in concluding that it had jurisdiction over Pulsar, because Pulsar never acknowledged receipt of the mailed summons and complaint as required by Fed.R.Civ.P. 4.

Judge Jordan's Decision noted that the Second Circuit's interpretation of Rule 4 does not strictly require personal service of the summons and complaint in the absence of written acknowledgement of receipt by the defendant, where actual receipt has occurred. In this Court's view, Judge Jordan properly relied upon *Morse v. Elmira Country Club*, 752 F.2d 35 (2d Cir.1984), which held that "strong factors of justice and equity" favor a finding that effective service has been made where mailed, pursuant to Fed.R.Civ.P. 4(c)(2)(C)(ii) and actually received, but not acknowledged. *Id.* at 40; *see also Darvoe v. Town of Trenton*, 785 F.Supp. 305, 308 (N.D.N.Y.), *aff'd*, 979 F.2d 845 (2d Cir.1992); *Lee v. Carlson*, 645 F.Supp. 1430, 1432 (S.D.N.Y.1986), *aff'd*, 812 F.2d 712 (2d Cir. 1987).

In the present case actual service was acknowledged by the defendant's president, Thomas Laviano, as discussed in his testimony at trial. Tr. Vol. V, at pp. 46–53. The defendant concedes that in the Second Circuit, a failure to follow the directives of Rule 4 is not fatal to a plaintiff's case. This Court is not persuaded by Pulsar's argument that numerous holdings to the contrary from courts of other circuits state a more proper view of the Rule. *See, e.g., Schnabel v. Wells*, 922 F.2d 726 (11th Cir.1991); *FDIC v. Mt. Vernon Ranch, Inc.*, 118 F.R.D. 496 (W.D.Mo.1988); *Wise v. Commissioner of I.R.S.*, 624 F.Supp. 1124 (D.Mont.1986).

■ Judge Jordan properly relied on the controlling law of the Second Circuit in concluding that actual receipt of the summons and complaint by the defendant satisfied the requirements of effective service and brought the defendant within the Court's jurisdiction. Similarly correct is Judge Jordan's conclusion that the statute of limitations ceased to run when the summons and complaint were actually received, so that this action was not barred by the four year statute of limitations. *See Morse*, 752 F.2d at 39–40.

■ The Court takes note of one error in Judge Jordan's Decision, which states that "[t]he mailing and actual receipt was a compliance with state law sufficient to stay the running of the statute of limitations." Deci-

sion, at p. 655 (citation omitted). Service was made under Fed.R.Civ.P. 4(c)(2)(C)(ii), not pursuant to the stricter requirements of the New York Civil Practice Law and Rules. This error is harmless in that it does not change the ruling in the case by affecting a substantial right of one of the parties. *See* Fed.R.Civ.P. 61 (stating that errors that are not inconsistent with substantial justice are harmless errors); *see also McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 554, 104 S.Ct. 845, 848, 78 L.Ed.2d 663 (1984) (citing *De Santa v. Nehi,* 171 F.2d 696 [2d Cir.1948]) and stating that it is well settled that appellate courts should act in accordance with the policy embodied in Rule 61.

 Finally, with regard to service, the defendant objected promptly after personal service, that such service was not made within 120 days of filing of the complaint. Judge Jordan properly held that such a defect is not jurisdictional and that Pulsar waived its objection by participating in pretrial proceedings without raising the defect. *See Datskow v. Teledyne, Inc.,* 899 F.2d 1298 (2d Cir.), *cert. denied,* 498 U.S. 854, 111 S.Ct. 149, 112 L.Ed.2d 116 (1990).

Accordingly, the decision of the trial court with regard to its jurisdiction over the defendant Pulsar and timeliness of the action is affirmed.

## C. The Stipulated Issue for Trial

The defendant contends that the lower court erred in applying the stipulation of the parties as to the issue to be tried. Judge Jordan stated in his December 17, 1993 decision that "[t]he parties agree that this case is governed by the Uniform Commercial Code and that the sole issue for trial is whether Pulsar has cured the defective delivery as provided in § 2–508.... It is the position of the defendant that it offered to cure, but that Allied rejected the offer." Decision, at p. 656.

Pulsar argues that the parties stipulated to limiting the issue at trial to whether Pulsar made a timely offer to cure. It is Pulsar's contention that pursuant to such a stipulation, it could prevail by establishing that it extended an offer to Allied to cure the defec-

tive goods. Pulsar argues that the trial court's decision implies that Judge Jordan mistakenly believed that it was the defendant's burden to demonstrate that an actual physical delivery of replacement goods had been made to the plaintiff. Pulsar further argues that because Judge Jordan did not limit the trial to the issue of whether there was an offer to cure, he came to the erroneous conclusion that Pulsar failed to establish facts that would lead to a verdict in its favor. *See Martin v. City of Cohoes,* 37 N.Y.2d 162, 371 N.Y.S.2d 687, 332 N.E.2d 867 (1975) (stating that in the absence of strong countervailing public policy, parties may consent to the law that is to be applied to the case); *see also Nederlandse Draadindustrie N.D.I. B.V. v. Grand Pre–Stressed Corp.,* 466 F.Supp. 846, 851 (E.D.N.Y.), *aff'd* 614 F.2d 1289 (2d Cir.1979).

Pulsar contends that this alleged misunderstanding by the trial court of the issue to be tried resulted in two errors, namely (1) an incorrect finding of fact regarding testimony relating to testing of the defective parts; and (2) a misapprehension of the ultimate issue by the trial court. Pulsar asks this Court to pose the question, "did Pulsar make an offer to cure," and based on the trial testimony to the effect that such an offer was made, find in its favor.

It is Allied's position that the trial was to address the "issue of cure," which was not limited to whether an offer to replace the goods was made. Each party draws the Court's attention to various letters in the file and statements in the trial transcript that phrase the issue to be tried alternatively as "offer to cure" or "issue of cure." In other words, there is evidence to support each party's contention as to the meaning of the stipulated issue.

 As a threshold matter, this court notes that the validity of a stipulation is dependant upon a clear and unequivocal expression, either in writing or on the record in open court. *See e.g., Orsini v. Kugel,* 9 F.3d 1042 (2d Cir.1993); *In Re Greenspan's Will,* 43 A.D.2d 998, 352 N.Y.S.2d 263 (3d Dep't 1974), *aff'd,* 36 N.Y.2d 737, 368 N.Y.S.2d 162, 328 N.E.2d 791 (1975). That type of clear stipulation was not made in this case. The

Court has reviewed the entire case file as well the record and finds no clearly stated agreement by the parties on the issue for trial. The record does suggest that the issue for trial was narrowed to exclude the question of whether defects were present in the computer chips. However, the record does not suggest that the parties and the court agreed to limit the question at trial to whether Pulsar had made an offer to cure rather than examine all elements of contractual cure as provided for in U.C.C. § 2–508.

## D. The Law of Contractual Cure

 In this Court's view, Judge Jordan properly applied the law regarding cure as set forth in Section 2–508 of the Uniform Commercial Code, which provides:

(1) Where any tender or delivery by the seller is rejected because non-conforming and the time for performance has not yet expired, the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery.

(2) Where the buyer rejects a non-conforming tender which the seller had reasonable grounds to believe would be acceptable with or without money allowance the seller may if he seasonably notifies the buyer have a further reasonable time to substitute a conforming tender.

*Id.* The plain language of this section reveals that contractual cure is a two step process. The first subsection requires (1) notification of the seller's intent to cure and (2) conforming delivery within the contract time. The second subsection requires (1) notification to the buyer and (2) substitution of conforming tender. This clearly entails more than a mere offer, but less than actual physical delivery, as illustrated by an examination of the term "tender" within the meaning of the U.C.C.

 The U.C.C. section concerning tender is Section 2–507, which provides that tender of delivery is a condition to the buyer's duty to accept the goods. "Tender entitles the seller to acceptance of the goods and to payment according to the contract." N.Y.U.C.C. § 2–507(1). "Tender" is further explained as follows:

The term "tender" is used in this Article in two different senses. In one sense it refers to "due tender" which contemplates *an offer coupled with a present ability to fulfill all the conditions resting on the tendering party and must be followed by actual performance if the other party shows himself ready to proceed.* Unless the context unmistakably indicates otherwise this is the meaning of "tender" in this Article and the occasional addition of the word "due" is only for clarity and emphasis. At other times it is used to refer to an offer of goods or documents under a contract as if in fulfillment of its conditions even though there is a defect when measured against the contract obligation. Used in either sense however, *"tender" connotes such performance by the tendering party as puts the other party in default if he fails to proceed in some manner.*

N.Y.U.C.C. § 2–503 Comment 1 (emphasis supplied). Tender of delivery under the Code requires the seller to put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery. *H. Sand & Co., Inc. v. Airtemp Corp.,* 934 F.2d 450, 454 (2d Cir.1991). The following passage from Professor Hawkland's U.C.C. treatise is instructive in understanding the meaning of "tender:"

The requirement that the seller must put and hold conforming goods at the buyer's disposition in order to make a tender of delivery is the necessary element of tender as used in its normal sense. As comment 1 to section 2–503 suggests, tender usually means "an offer coupled with a present ability to fulfill all the conditions resting on the tendering party and must be followed by actual performance if the other party shows himself ready to proceed." In this usual sense tender involves an offer by the seller to deliver conforming goods. Occasionally, however, the term "tender" is used in Article 2 of the UCC as an offer by the seller to deliver what he believes incorrectly to be conforming goods. Such a tender, of course, does not require the buyer to accept and pay, but it does oblige

him to take the steps necessary for proper rejection. Acceptance means that the price must be paid by the buyer but, of course, he can offset against the price the damage that results from any nonconformity.

"Tender of delivery," is used in section 2–503 in its usual sense, as an offer coupled with a present ability to perform in accordance with the contract, followed by actual performance if the buyer is willing and able to go ahead with his part of the deal. *From this definition it follows that the seller does not tender delivery for purposes of section 2–503 until he is in a position to actually perform. Thus, there can be no tender of delivery if the goods are not in existence or otherwise not available for the buyer to take possession. Conversely, the mere fact that a seller has the ability to actually perform does not constitute a tender of delivery until he offers to do so.*

Hawkland UCC Series § 2–503:02 (Art. 2) (citations omitted). It is clear that although tender does not require that the seller put the goods in the possession of the buyer, the seller must have the present ability to do so in order to preserve its rights.

Moreover, the cases cited by the defendant support this reading of the rule. *Traynor v. Walters,* 342 F.Supp. 455, 460 (M.D.Pa.1972) ("the sellers notified the buyer that they had an additional 600 Scotch Pine trees *available for delivery* ") (emphasis supplied); *T.W. Oil, Inc. v. Consolidated Edison Co.,* 57 N.Y.2d 574, 578, 457 N.Y.S.2d 458, 461, 443 N.E.2d 932, 935 (1982) ("The very next day, February 21, plaintiff offered to cure the defect with a substitute shipment of conforming oil *scheduled to arrive . . . on February 28"*) (emphasis supplied); *Uchitel v. F.R. Tripler & Co.,* 107 Misc.2d 310, 434 N.Y.S.2d 77, 79 (App.Term 1st Dep't 1980) ("All that is needed for proper tender under current law is that the *less* rigorous requirements of section 2–503—*holding the goods at the buyer's disposition* and giving him reasonable notice— be fulfilled") (emphasis supplied); *Bartus v. Riccardi,* 55 Misc.2d 3, 284 N.Y.S.2d 222 (N.Y.City Ct.1967) (seller presented buyer with option to choose between two models of

hearing aid, which would be ordered for delivery to the buyer). Even in the *T.W. Oil* and *Bartus* cases, where the sellers were not in present physical possession of the goods to be substituted, the sellers had identified those goods and had a present ability to effect delivery. *T.W. Oil,* 457 N.Y.S.2d at 460, 443 N.E.2d at 934; *Bartus,* 284 N.Y.S.2d at 223; *see also Travelers Indem. Co. v. Maho Mach. Tool Corp.,* 952 F.2d 26 (2d Cir.1991) (seller "offered to cure the defect in performance of the contract by replacing the machine with a new one to be manufactured in a month."). The defendant is correct in stating that these cases do not require that the seller put the buyer in actual possession of the goods to effect cure under the Code. However, these cases do not stand for the proposition urged by Pulsar, namely, that an offer to make conforming goods available, without more, preserves the seller's rights under U.C.C. § 2–508.

### E. Actual physical delivery

Pulsar argues that Judge Jordan's Decision is based on an erroneous belief that actual, physical delivery of goods is necessary if a seller is to obtain the benefits of U.C.C. 2–508. Pulsar contends that the substance of Judge Jordan's ruling is that Pulsar did not affect cure because it did not make actual physical delivery and that the following passages of the decision reveal that Judge Jordan equated cure with actual, physical replacement:

> The defense testimony, even if found to be established by preponderance of the credible evidence, is not sufficient to constitute a cure within the meaning of the Uniform Commercial Code § 2–508. . . .

> Allied's refusal to accede to the proposed method of procedure for curing the defect could not defeat Pulsar's right to replace the parts. . . .

> . . . .

In sum, Pulsar never communicated an unconditional intention to cure and never made or even tendered a conforming delivery.

Decision, at pp. 656–57. Nothing in these passages indicates that Judge Jordan misap-

plied Section 2–508 or made a ruling adverse to Pulsar on the basis that an actual physical delivery had not occurred. It is clear from the testimony that replacement parts were not delivered. Also, it could be concluded by a reasonable trier of fact that a conforming delivery, which would preserve the seller's rights under Section 2–508, was not "even tendered."

■ As discussed above, cure is notification followed by conforming delivery within the contract time, under subsection one of Section 2–508, or within reasonable time to substitute a conforming tender, under subsection two. Based on the testimony, it was reasonable for Judge Jordan to have concluded that Pulsar did not communicate an unconditional intention to cure nor did Pulsar put and hold conforming goods at Allied's disposition, so that Allied would have to accept or reject the goods.

F. Testing of the Allegedly Defective Goods

Pulsar also argues that Judge Jordan's determination that the defendant had not effected cure was "significantly, if not primarily, influenced" by the belief that the defendant refused to pay the cost of testing the returned parts to determine which among them were in fact defective. Pulsar refers to the following statements in the Decision: (1) "[t]here was no testimony that Pulsar was willing to pay the cost of the testing"; and (2) "Pulsar never offered to conduct the proposed tests at its own expense." Decision, at pp. 6, 7.

Pulsar notes a number of instances in the record where testimony indicated that there was a willingness on the part of Pulsar to test the parts or a belief that Pulsar planned to pay for the testing. For example,

The Court: If I can interrupt just a moment? At whose expense was the testing to be?

The Witness (William Graff, Pulsar employee): I believe it was Pulsar, but I'm not positive about that.

Tr. Vol. V, at p. 66.

Q. Are you saying Allied wouldn't pay that money to get them tested?

A. I was going to pay the money to get them tested.

Tr.Vol. III, at p. 48 (testimony of Pulsar President Thomas Laviano).

Q. Did you ask them to pay for the testing?

A. I'm not 100 percent sure, but I think we paid for the testing.

Tr.Vol. IV, at p. 40 (testimony of Peter Woll, former Pulsar employee).

■ These excerpts demonstrate that Judge Jordan did err in stating that there was no testimony in the record to the effect that Pulsar offered to pay for testing. However, the error is harmless in that it does not effect the outcome of the case. See Fed. R.Civ.P. 61; McDonough Power Equip. v. Greenwood, 464 U.S. 548, 554, 104 S.Ct. 845, 848, 78 L.Ed.2d 663 (1984). Even if Judge Jordan had properly acknowledged that Pulsar testified to a willingness, intent or belief with regard to bearing the cost for testing, his conclusion with regard to cure, based on the legal standards discussed above, would not have been altered. Whatever Pulsar's attitude toward testing may have been, the fact remains that Pulsar did not hold conforming goods at Allied's disposition so to meet the requirements of cure. In this Court's view, the testimony reproduced above does not contradict the ultimate conclusion reached by Judge Jordan that Pulsar did not present evidence to establish that cure was effected, within the meaning of the U.C.C.

■ The testimony regarding Pulsar's intent or willingness to pay for testing prior to making conforming goods available is equivocal and uncertain at best. Furthermore, it does not appear, as the defendant urges, that Judge Jordan put primary weight on what he erroneously recalled to be an absence of testimony regarding payment for testing. Judge Jordan clearly stated that the "first and foremost" consideration is that Pulsar had a unilateral right to cure, which was not dependant on any negotiations with Allied regarding testing, replacement or repayment or anything else. Decision, at p. 656. The record fully supports the conclusion that Pulsar did not exercise that right

with conduct that would bar Allied from collecting damages if it failed to respond.

Judge Jordan states in the Decision, at pp. 656–57 that

> [t]he defense testimony, even if found to be established by a preponderance of the credible evidence, is not sufficient to constitute a cure within the meaning of the Uniform Commercial Code § 2–508.
>
> First and foremost, Pulsar's right to cure is not dependent on the acceptance of its offer by Allied. Pulsar had an absolute right to cure by tendering replacement parts. Allied's refusal to accede to the proposed method of procedure for curing the defect could not defeat Pulsar's right to replace the parts. Further, it was not a refusal to accept a tender.
>
> Further, the cost of securing compliance with the tender of replacement parts (the cost of the testing), is the obligation of Pulsar. *Travelers Indemnity Co. v. Maho Machine Tool Corp.,* 952 F.2d 26, 29 (2d Cir.1991). Pulsar never offered to conduct the proposed tests at its own expense.
>
> In sum, Pulsar never communicated an unconditional intention to cure and never made or even tendered a conforming delivery. It has not established its defense of cure under U.C.C. § 2–508.

Decision, at pp. 656–57. Even if Allied did equivocate regarding replacement or refund, or even if Allied stated to Pulsar that it wanted a refund rather than replacement, Judge Jordan correctly held that nothing Allied could say would have the effect of depriving the defendant of the right to cure, which is absolute. Pulsar did not have to wait for Allied to state that it would accept replacements. Pulsar simply was required to notify Allied that replacement goods were ready for delivery and shift the burden to Allied to respond by accepting or rejecting Pulsar's tender of delivery. In either case, Pulsar would have fulfilled its obligation under the contract and Allied would have been foreclosed from seeking damages.

In this Court's view, Judge Jordan did not place determinative weight upon the matter of payment for testing defective parts. The Decision cites *Travelers Indemnity Co. v. Maho Mach. Tool Corp.,* 952 F.2d 26, 29 (2d Cir.1991), which holds that under U.C.C. § 2–508, the opportunity to cure and the burden (cost) of replacement lie with the seller. Just as a refusal to bear this burden would demonstrate that one of the elements of cure was missing, a willingness to bear the burden would demonstrate that one of elements of cure was present. But the presence of one element, when others are missing, does not guide this case to a different conclusion than the trial judge reached.

■ Even if Pulsar clearly established a willingness to pay for testing the defective goods, then more than payment for the testing was required of Pulsar in order to preserve its rights under Section 2–508. Under the statute, a seller who (1) has the present ability to deliver conforming goods and (2) puts goods at the buyer's disposal, shifts the burden to the buyer to either accept the goods or reject them and be barred from collecting damages. In this case two things were required of Pulsar to entitle it to the protection of Section 2–508. First, Pulsar had to have the present ability to deliver conforming goods, bearing any attendant testing costs. Second, Pulsar had to put the goods at Allied's disposal. While the testimony suggests that Pulsar may have been preparing to satisfy these conditions, the testimony does not support a conclusion that they were fulfilled.

■ The Second Circuit discussed the issue of tender in a case that involved delivery of goods to the buyer prior to their testing by the seller. *H. Sand & Co., Inc. v. Airtemp Corp.,* 934 F.2d 450 (2d Cir.1991) concerned a situation in which goods were physically delivered to the seller before the buyer conducted the agreed upon testing of the goods. The question for the court was whether the statute of limitations for a breach of warranty action commenced on the date of physical delivery or on the date that the testing was concluded. The following guidance by the Second Circuit is relevant to the issue before this Court:

> whether testing was or was not a precondition to the delivery of the chillers is not the issue upon which this case hinges. Rather, it is whether Airtemp, when it originally

shipped the chiller in March 1978, intended to and in fact did place chiller #4 at Sand's disposition. The fact that Airtemp may not have wanted to turn the chiller over because it wished to test it first is a subjective motive, peripheral to the main question before us: whether, viewing the facts objectively, delivery was in fact tendered.

*H. Sand,* 934 F.2d at 455. Applying this reasoning to the present case, it is clear that Pulsar's subjective intent or willingness to pay for and conduct tests on the allegedly defective goods is merely "peripheral to the main question" of whether delivery was tendered. Based on the objective standard set forth in *H. Sand,* the facts of this case support a finding that Pulsar did not tender delivery within the meaning of the U.C.C.

Accordingly, Judge Jordan's error in not acknowledging the testimony relating to Pulsar paying for testing the allegedly defective goods is harmless error in that it does not effect the final result. *See* Fed.R.Civ.P. 61; *McDonough Power Equipment v. Greenwood,* 464 U.S. 548, 554, 104 S.Ct. 845, 848, 78 L.Ed.2d 663 (1984).

■ Further, a review of the record reveals that Judge Jordan did not base his determination on a misunderstanding that U.C.C. Section 2–508 required that there be an actual physical delivery. It is this Court's view that Judge Jordan correctly understood that the principles of "cure" require that actual physical delivery must only be presently possible. In this case it was reasonable to find that actual physical delivery was not presently possible. Accordingly, Judge Jordan's conclusion that Pulsar did not effect a cure within the meaning of the Uniform Commercial Code is affirmed.

### G. The Weight of the Evidence and the Issue of Credibility

Pulsar argues that it is entitled to a directed verdict because (1) the weight of the evidence established that Pulsar made a timely offer to replace the defective parts, and (2) the only evidence to the contrary was that of plaintiff's witness Jerry Norton, who was not a credible witness.

■ With regard Pulsar's offer, the Court has already determined, as discussed above, that Judge Jordan ruled correctly that an offer alone does not constitute "cure." Therefore, even if the evidence established that Pulsar was willing to cure or made an offer to cure, that willingness or offer is insufficient in the absence of a present ability to deliver the goods.

■ Pulsar argues that the only testimony offered by the plaintiff to rebut the defendant's evidence that an offer to cure had been made was given by Jerry Norton. Pulsar contends that Norton's lack of credibility is evident in his testimony regarding three other matters that are not the subject of this appeal. The Court recognizes that the trial court is entitled to great deference in judging the credibility of witnesses. *See* Fed. R.Civ.P. 52(a); *Anderson v. Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). Where two permissible views of the evidence exist, the factfinder's choice between them is not clearly erroneous. *Anderson,* at 574, 105 S.Ct. at 1511 (citing *United States v. Yellow Cab. Co.,* 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949)). The Second Circuit has repeatedly applied this standard, holding that "[a]ssessment of the credibility of witnesses is peculiarly within the province of the trier of fact and is entitled to considerable deference." *Healey v. Chelsea Resources, Ltd.,* 947 F.2d 611, 618 (2d Cir.1991) (citing *Anderson, supra,* and noting that where evidence would support either of two competing inferences, the fact that the appellate court might have drawn another inference does not entitle it to overturn the trial court's choice of either).

In this case it not necessary to reach the issue of credibility because, as stated above, the testimony in question related only to an offer to cure, which, in the absence of a tender of delivery, does not constitute cure. Accordingly, the Court declines to disturb the trial court's decision based on the appellant's challenge to the credibility of a witness.

### H. Damages

After concluding that Pulsar did not establish a defense under U.C.C. § 2–508, Judge

Jordan determined that the proper measure of damages was $365,750.00, which represents the purchase price paid to Pulsar by Allied for 35,000 computer chips at $10.45 each. That figure was reduced by $34,100, a credit that both parties agreed was owed to Pulsar by Allied in connection with a separate transaction that is not at issue in this case. With regard to damages, Judge Jordan stated the following:

Allied also seeks reimbursement of the $70,875.00 it paid for the 25,000 substitute replacement parts. It is not entitled to this money over and above the recovery of the money it had paid to Pulsar for those parts. These replacement parts were secured at a far lesser cost than those purchased from Pulsar. Allied suffered no additional damage by purchasing replacement parts from a separate supplier.

Pulsar argues that Allied's damages should be limited to its cost in securing replacement parts. The price of these parts had plummeted during the intervening time, and the issue is whether Allied or Pulsar should reap the benefit of the reduction in price. The benefit falls to the purchaser, Allied. The initial sales transaction is to be treated independently of the cover transaction and any gains made on such cover will not defeat or diminish the buyer's damages as against the original seller. *Fertico Belgium v. Phosphate,* 70 N.Y.2d 76, 84, 517 N.Y.S.2d 465, 510 N.E.2d 334 (1987).

Decision, at p. 657.

Pulsar argues that the trial court erred in awarding damages to Allied in excess of the anticipated benefit of its bargain with the defendant, namely the $27,500.00 profit that Allied expected to realize as a result of reselling 50,000 chips to Apple. Pulsar contends that the damage award of $365,750.00 gives Allied a double recovery, placing the plaintiff in a better position than it would have been in had the purchase and sale contract with Pulsar been fully performed. Pulsar argues that Allied was paid $385,000.00 for the 35,000 parts by Apple, who never requested a refund, but accepted substitute goods in fulfillment of the purchase order. Testimony at the trial by an employ-

ee of Apple, Donal Cownan, supports the conclusion that the Apple purchase order was left open to accommodate the replacement parts. Tr. Vol. II, at pp. 119–120. In other words, when Allied replaced the defective goods, it was satisfying the terms of the original sales agreement with Apple, not transacting a new sale.

Pulsar contends that if it is required to pay Allied the sum of $365,750.00, Allied will realize a much higher profit than the $27,500.00 it originally expected to earn as a result of its sale to Apple. The evidence reveals that Allied's anticipated profit figures with regard to the 35,000 chips in question would have been $19,250.00 had the Pulsar–Allied–Apple transaction been fully performed based on the following: (a) Allied purchased the 35,000 parts at $10.45 each for a total cost of $365,750.00; (b) Allied resold the 35,000 parts to Apple at $11.00 each, for a total of $385,000.00. According to Pulsar, the payment in full by Apple means that the only damage sustained by Allied was the $70,875.00 cost of obtaining substitute goods. For this reason, Pulsar urges the Court to limit Allied's recovery to $70,875.00.

In response, Allied contends that the damages awarded by Judge Jordan, which represents the purchase price paid by Allied to Pulsar for the 35,000 defective computer chips it later justifiably rejected and returned, were properly measured pursuant to the plain language of the U.C.C. 2–711(1). Allied argues that if its damages are limited to the $70,875.00 cover cost, then Pulsar will have wrongfully gained $294,875.00 because Pulsar will have (a) the $365,750.00 purchase price originally paid by Allied (less $70,875.00) and (b) the 35,000 parts that were returned by Allied.

U.C.C. § 1–106(1) provides that

(1) The remedies provided by this Act shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed but neither consequential or special nor penal damages may be had except as specifically provided in this Act or by other rule of law.

Pulsar argues that the clear directive of this provision is that Allied's recovery should be

**630**

an amount, namely $70,875.00, that leaves it with the $27,500.00 profit that it expected to realize on the entire resale contract with Apple. Pulsar further argues that other components of the transaction are irrelevant as long as Allied recoups $27,500.00 over its expenses.

 Allied draws the Court's attention to Section 2–711 of the U.C.C., which provides in pertinent part:

> (1) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (Section 2–612), the buyer may cancel and whether or not he has done so may *in addition to recovering so much of the price as has been paid*
>
> > (a) "cover" and have damages under the next section as to all the goods affected whether or not they have been identified to the contract[.]

N.Y.U.C.C. § 2–711(1)(a) (emphasis supplied). Allied argues that the plain language of this section provides an aggrieved buyer with the right to return of the purchase price as well as other remedies such as cover. The case law supports this interpretation of New York law. *See e.g., Kashi v. Gratsos,* 790 F.2d 1050, 1056 (2d Cir.1986) ("Under New York law, a frustrated buyer is entitled to recover both the purchase price paid, N.Y.U.C.C. § 2–711(1) (1964), *and* 'the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this Article (Section 2–715), but less expenses saved in consequence of the seller's breach.' *Id.* § 2–713(1).") (emphasis in original); *Computerized Radiological Services v. Syntex Corp.,* 595 F.Supp. 1495, 1511 (E.D.N.Y.) *aff'd* in part, *rev'd* in part 786 F.2d 72 (2d Cir.1986) ("[UCC] Sections 2–711 and 2–712 prescribe the remedies normally available to a buyer who revokes acceptance: the buyer may cancel the contract, recover the purchase price, and recover the cost, above the contract price, of purchasing replacement goods, as well as incidental and consequential damages."); *Murphy v. Mallard Coach Co.,*

179 A.D.2d 187, 582 N.Y.S.2d 528, 530 (3d Dep't 1992) ("Under UCC article 2, upon delivery of goods that, at the time or subsequent thereto, are determined to be nonconforming or fail to meet the quality terms contained in the contract of sale, a buyer has three options: (1) accept the goods and obtain, as a general rule, the difference between the value of the goods as warranted and the value as accepted by bringing a suit for breach of an express warranty or one of the implied warranties of quality (UCC 2–607, 2–714[2] ) (2) *reject the goods and, to the extent that the seller fails to reasonably cure the defect (UCC 2–508), cancel the contract and recover, inter alia, so much of the purchase price as has been paid (UCC 2–602, 2–508, 2–711),* or (3) revoke acceptance upon discovery of the nonconformity and obtain the same remedies as are available upon rejection (UCC 2–608, 2–711).") (emphasis supplied); *Maxwell v. Crabtree Ford, Inc.,* 144 Misc.2d 95, 543 N.Y.S.2d 626, 630 (N.Y.Just.Ct.1989) ("As to damages, the buyer may recover the purchase price under Section 2–711 and incidental and consequential damages under Section 2–715."); *see also* 77A C.S.J., *Sales* § 379 (1994) ("Under the Uniform Commercial Code [§ 20711(1) ] where the seller fails to make delivery or repudiates, or the buyer rightfully rejects or justifiably revokes acceptance, the buyer may recover so much of the price as has been paid.") (footnotes omitted).

Subdivision (3) of Section 2–711 also supports the conclusion that the Code intends to provide for recovery of the purchase price by an aggrieved buyer. The statute provides, "[o]n rightful rejection or justifiable revocation of acceptance a buyer has a security interest in goods in his possession or control for any payments made on their price...." Under both subsections one and three, a buyer is entitled to recover its total investment in goods that are later rejected.

In the Court's view the trial court properly awarded Allied damages in the amount of the purchase price paid. However, the Court questions the trial court's interpretation of and reliance on the case of *Fertico Belgium, S.A. v. Phosphate Chem. Export Assoc., Inc.,* 70 N.Y.2d 76, 517 N.Y.S.2d 465, 510 N.E.2d

334 (1987) to support the damage award. Judge Jordan's decision states that "[t]he initial sales transaction is to be treated independently of the cover transaction and any gains made on such cover will not defeat or diminish the buyer's damages as against the original seller. *Fertico Belgium v. Phosphate,* 70 N.Y.2d 76, 84, 517 N.Y.S.2d 465, [510 N.E.2d 334] (1987)." Decision, at p. 567. It is this Court's view that the *Fertico* decision, which was based on what the Court of Appeals characterized as "exceptional" and "peculiar" facts, was not intended to stand for the broad proposition stated by the trial court in his decision in this case. The New York Court of Appeals itself commented that "our decision does not fit squarely within the available Uniform Commercial Code remedies...." *Fertico,* 70 N.Y.2d at 83, 517 N.Y.S.2d at 469, 510 N.E.2d at 338.

In *Fertico,* the seller Phoschem failed to perform its obligations under a contract for the sale of shiploads of fertilizer by failing to deliver in timely fashion. Given notice of the late delivery, the buyer Fertico obtained cover goods at an additional cost of $700,000.00 from another source to avoid breaching its obligation to a third party, one Altawreed. However, the shipment from Phoschem eventually arrived and Fertico took title to the goods because Phoschem had already negotiated Fertico's letter of credit in payment for the Phoschem shipment. Fertico sold the Phoschem shipment to a fourth party, Janssens, realizing a profit of $454,000.00. On appeal, the New York Appellate Division First Department determined, among other things, that Fertico's damages had to be reduced by the profits from the Janssens' sale. The New York Court of Appeals reversed on the basis that Fertico, as a trader, would have pursued the Janssens sale even if Phoschem had fully performed the original contract with Fertico. The Court of Appeals stated that the sale to Janssens was an independent transaction and quoted the following passage from Professor Corbin's U.C.C. treatise:

'Gains made by the injured party on other transactions after the breach are never to be deducted from the damages that are otherwise recoverable, unless such gains could not have been made, had there been no breach.'

*Fertico,* 70 N.Y.2d at 84, 517 N.Y.S.2d at 469, 510 N.E.2d at 338 (quoting 5 Corbin, Contracts § 1041, at 256).

In this Court's view the *Fertico* decision does not hold that cover by a buyer to fulfill obligations on a third party contract is a separate and independent transaction. With regard to the Phoschem–Fertico–Altawreed contract, the Court of Appeals clearly held in accordance with settled principles that Fertico was entitled to receive a covering buyer's damages "equal to the difference between the presumably higher cost of cover and the contract price, plus incidental or consequential damages suffered on account of the breach, less expenses saved (UCC 2–712[2])." *Fertico,* 70 N.Y.2d at 82, 517 N.Y.S.2d at 468, 510 N.E.2d at 337. The transaction that the Court of Appeals did analyze as separate and independent was the subsequent sale by Fertico to Janssens, a sale that the court found Fertico would have made regardless of its dealings with Phoschem.

Pulsar points out that the *Fertico* case has been criticized as permitting a buyer to have remedies beyond those intended by the U.C.C. and cites the following commentary:

The Code contemplates that the buyer will make a choice—either accept or reject the goods. The solution reached by the [*Fertico*] majority allows the buyer to have it both ways—profit as if the goods were accepted, and damages as if the goods had been rejected. The fault lies in treating the goods as accepted goods and then using the cover measure of damages as a test of the loss suffered. The [*Fertico*] majority's solution puts the buyer in a better position than the buyer would have been in had the contract been performed. This result is not warranted either under the generous remedies policy of the Code or by the scheme of remedies it provides.

Donnelly & Donnelly, Commercial Law, 39 Syr.L.Rev. 159, 183 (1988) (citations omitted). Pulsar urges the Court to vacate an award that gives Allied more than the $19,250.00 profit it originally expected for the 35,000 chips, in that such an award will put Allied in a better position than it would have been in

had the contract with Pulsar been performed. While this argument sounds fair and reasonable at first blush it is contrary to the express words of the U.C.C.

However, notwithstanding the use of *Fertico* by Judge Jordan, arguments regarding the meaning this decision are off the mark as far as the present case is concerned. Here, Allied originally sought the goods from Pulsar to fill the Apple purchase order. When Allied returned the defective chips, it covered the Apple resale contract with substitute goods. Unlike the aggrieved buyer in *Fertico*, Allied did not accept or retain the goods and resell them to another buyer in a new transaction after Pulsar's breach. Rather, in a factual scenario precisely fitting within the express statutory language of Section 2–711, Allied rejected and returned the defective goods and sought to fulfill its obligations by covering. Unlike *Fertico*, this case must be resolved by the available express remedies set forth in the U.C.C.

Judge Jordan ruled correctly that Allied cannot recover additional damages for the cost of cover in this case. He reasoned that Allied is not entitled to damages because the *Fertico* case directs that the cover transaction should be analyzed separately with any gains from the cover transaction falling to the benefit of the aggrieved buyer. This Court does not agree that *Fertico* holds that a cover transaction should be analyzed as independent transaction. However, *Fertico* is instructive with regard to this case to the extent that it explains that a covering buyer's damages are equal to the difference between the contract price and the *"presumably higher* cost of cover." *Fertico*, 70 N.Y.2d at 82, 517 N.Y.S.2d at 468, 510 N.E.2d at 337 (emphasis supplied). In other words, the covering buyer's damages are its costs above the contract price of purchasing replacement goods. Allied's cost of cover was less than the contract price. Where the cost of cover is less than the contract price, and the buyer recovers the purchase price pursuant to Section 2–711, the buyer sustains no damages in covering.

Pulsar cites no authority for the proposition that a breaching seller is entitled to retain a portion of the purchase price upon a buyer's proper rejection and return of defective goods in the event that the buyer covers its resale contract at a lower price than it paid to the breaching seller. In such a situation the aggrieved buyer sustains no cover damages as a consequence of the seller's breach and the seller's liability is limited to the purchase price paid as a matter of clear statutory mandate.

For the reasons stated above, this Court affirms the award of damages to the plaintiff Allied in the amount of $331,650.00 plus interest, which represents the purchase price of $365,750.00 paid to Pulsar for 35,000 computer chips that were rejected as defective and returned, less $34,100.00 that the parties agree was owed to Pulsar by Allied as the result of a separate transaction that was not at issue in this action.

### CONCLUSION

Based on the foregoing, the judgment of the trial court is affirmed in all respects.

SO ORDERED.